# Richmond.

## KEMP v. THE COMMONWEALTH.

### APRIL 16TH, 1885.

1. CRIMINAL JURISDICTION AND PROCEEDINGS—*Aiding and abetting.*—It is well-settled law that mere presence is not sufficient to render one guilty of aiding and abetting the commission of crime. There must be something done or said by him showing his consent to the felonious purpose and contributing to its execution. *Lee Reynolds* v. *Com'lth,* 33 Gratt. 834.

2. IDEM—*Case at bar*—The circumstances indicate that though W. did kill the deceased, and that K. was present, yet the latter did not aid or abet in the commission of the crime.

Error to a judgment of the corporation court of the city of Norfolk, rendered against William A. Kemp, whereby he was sentenced to imprisonment in the state penitentiary for the period of five years for the murder in the second degree of one Junius A. Rogers.

The indictment was against Charles L. Whitehurst, William A. Kemp and James T. Guy, jointly, charging the first with murder in the first degree, and the other two with being present, counseling, aiding, abetting and assisting the said Whitehurst in the commission of the crime. The prisoners elected to be tried separately. See *Whitehurst's case,* 79 Va. 556.

Kemp moved for a new trial on the ground that the verdict was contrary to the law and the evidence and that the court misdirected the jury. The court overruled the motion, and the pris-

oner obtained from one of the judges of this court a writ of error and *supersedeas* to the judgment.

Opinion states the case.

*John Goode* and *Parker & Allen*, for prisoner.

*Attorney-General, F. S. Blair*, for the commonwealth.

RICHARDSON, J., delivered the opinion of the court.

On the 4th day of February, 1884, a special grand jury for the city of Norfolk found an indictment against Charles L. Whitehurst, James T. Guy, and the plaintiff in error, William A. Kemp, for the murder of Junius A. Rogers, on the 20th day of January, 1884.

The indictment contains three counts, in each of which it is charged that the said Charles L. Whitehurst inflicted the mortal wound, and that the said James T. Guy and the plaintiff in error, the said William A. Kemp, were present, counseling, aiding, abetting, and assisting the said Charles L. Whitehurst in the commission of the said murder. On the said indictment Whitehurst was, in the corporation court for the city of Norfolk, duly tried, convicted of murder in the second degree, and sentenced to confinement in the penitentiary for the term of twelve years, that being the period found by the jury which tried the case; which finding and sentence was subsequently, on writ of error, affirmed by this court. See *Whitehurst* v. *Commonwealth*, 79 Va. 556. Subsequently, to wit: on the 28th day of November, 1884, the plaintiff in error was, in said corporation court, separately tried, found by the jury guilty of murder in the second degree, the term of his imprisonment in the penitentiary fixed at five years, and was sentenced accordingly by said court. On a writ of error, awarded by one of the judges of this court, the case is here for review.

Upon the rendition of the verdict, the prisoner, by his coun-

sel, moved the court to set aside the verdict, upon the grounds,
(1) that the verdict was contrary to the law and the evidence,
and (2) because of misdirection.

By two bills of exception, taken by the prisoner at the trial,
the case is made fully to appear.

The first bill of exceptions is to the judgment of the court
overruling the prisoner's motion to set aside the verdict and
grant him a new trial. This bill of exceptions sets out all the
evidence in the cause, as certified by the trial court, and will be
first considered. There is really no conflict of evidence, and
therefore it may be considered, practically, a certificate of facts
proved.

There is really no material fact touching the conduct of the
plaintiff in error on the occasion of the homicide in question,
that is not minutely detailed in the evidence of Henry B. Rear-
don, the principal witness for the commonwealth; nor is there
anything in all the evidence in conflict with his statement in
any material particular, though the statements of other witnesses
are, in some respects, much fuller. The substance of Reardon's
statement is, that on the night of the 19th day of January, 1884,
he and the deceased, Rogers, had been together playing pool and
drinking beer, from about eight or nine o'clock until about
twelve o'clock; that neither Rogers nor himself were affected
by the beer they had drank, witness having taken some eight
glasses; that they that night, later, visited several places, among
them a house of ill-fame in said city, kept by Maud Earl, where
they remained half-hour or more, when Rogers left, ahead of
Reardon, and started down the street. and then Reardon went
out, overtook Rogers, and went with him to another house of
ill-fame, kept by Nannie Gale, on Cove street, where Rogers
had an engagement to stay all night, and. at or near the front
door of this house, they found several persons, one of them
being Wm. A. Kemp, the plaintiff in error here.

Just here let us drop, for the time being, Reardon's state-
ment, to be resumed after tracing the party of which Kemp

was one, to the same place, the house of Nannie Gale, in the back yard of which the unfortunate homicide occurred.

J. T. Murden, another witness for the commonwealth, says: "About 12 o'clock, Saturday night, January 19th, 1884, Kemp and I went to a barber shop, got shaved, and went to Nebeling's saloon, on Church street, to get a sandwich. While there we met Charles Whitehurst, the three Winslow boys, and James T. Guy. I drank with Guy. After awhile it was proposed to go down town. We went down Church street in twos, until near Cove street, where it crosses Church street, when some one in the crowd said, 'turn to the left.' We went down Cove street toward Fenchurch, until we got to No. 121, where Nannie Gale keeps. When we got to Nannie Gale's, Charles L. Whitehurst went up in the porch and rang the door-bell. Some one responded, but I don't know what was said. Just then two men" (Reardon and Rogers) "came across the street and went up in the porch. They soon came down and went in the lane. They were followed by Charles Whitehurst, Kemp, Guy, and one of the three Winslow boys. I stood outside talking to one of the Winslows, and his brother, who had just gone up the lane, came back, when he and his brothers went home, at least they left, saying they were going home. Winslow was only in the lane a minute or so. Soon after Winslow came out, Guy came out, and said, 'I have received a hell of a blow in the eye.' I asked Guy who struck him? He said Rogers. I asked him what for? He said he did not know. After talking about it for a few minutes, Guy said to me, come, let's go up and see what they are doing. I said, I won't do it, if there is going to be a row. Guy started up the lane, and when he had got a few feet up the lane, Charles Whitehurst came out in a great hurry, Kemp close behind him, and Guy immediately behind Kemp. I don't think Guy could have gotten more than one-third of the way up the lane before he met Whitehurst and Kemp coming out. Whitehurst came out hurriedly, Kemp following him. When they got to the head of the lane, heard Whitehurst say,

'I hit that fellow a hell of a blow with an axe.' Whitehurst and Kemp then started up Cove street, and Guy and I followed them. When we overtook them on Fenchurch street, I said to Kemp, 'why don't you go back and get your hat?' Whitehurst said, 'Murden, you don't know anything; I hit that man a hell of a crack on the head with an axe.' We then went on, Kemp and Whitehurst in front, until we got to the corner of Fenchurch and Charlotte streets, when I said to Whitehurst, 'Charlie, you did not hit that man with an axe sure enough?' Whitehurst said, 'yes, I did.' I said, 'did you hit him hard?' He said, 'to tell you the truth, I was so mad and excited, I don't know how hard I hit him, but I expect I cracked his skull.' "

Now let us resume Reardon's statement where we left it off on his arrival at the house of Nannie Gale, in company with Rogers. Reardon does not state whether, when he and Rogers arrived in front of Nannie Gale's house, where they found the other party, that any recognition passed, or that a word was spoken by any one of either party. From his statement, it appears that Whitehurst, one of the party found there, was in the porch. Reardon and Rogers went into the porch, and Rogers either rang the bell or knocked, but failing to get in they came down from the porch and went up the lane to the back door, Rogers ahead, and Reardon next, followed by Whitehurst, Guy and Kemp, and so Reardon thought, by a fourth one, part of the way up the lane. This was, doubtless, one of the Winslow boys, who went only a part of the way up the lane, as explained by the testimony of the witness, Murden. In the order named, these five persons entered the back yard to the house of Nannie Gale, and then into a narrow, dark alley or passage way between the kitchen and back door of said house, and some thirty feet long. Here, Reardon says: "When we reached the narrow passage way leading to the back door, Rogers said to the parties, 'You are not going in here; you did not come with us and you are not going in with us:' after

some *other words*, blows commenced near the back door. When the fuss began Rogers was on the steps. I saw all three men (Kemp, Guy and Whitehurst) strike out at Rogers, but cannot say if they hit him or not. I took no part in the scuffle in the passage way; was not struck, nor did I strike anyone. When we got back in the yard—Kemp, Guy and Whitehurst getting into the yard first—I became immediately engaged in fight with Kemp. While thus engaged with Kemp, I saw Rogers, who stood near the end of the kitchen, apparently in a dazed condition. I felt surprised that Rogers did not come to my rescue, for I knew that he would fight. At the time I saw a man with uplifted arm, I heard a thud and Rogers fell, and immediately the man ran. I called for assistance, and Rogers was carried into the house. I did not think he was much hurt. I left him in charge of the inmates of the house, telling them if Rogers needed a physician to send for one. I was not armed during the time, nor do I know that Rogers was. He was not in the habit of carrying a weapon. I saw no weapon that he had." Reardon further testified that Kemp followed next to him and Rogers going up the lane; that Kemp, when the fight began, (that is, in the back yard) first struck him, and he struck back; that Kemp could not have struck the blow that felled Rogers; that at that time he (Reardon) and Kemp were clinched, and that it was at that time he saw the hand uplifted; and that he did not recognize the man, nor see what was in his hand; he (Reardon) was next to the man who struck Rogers; that the man stood about four feet from him; that he saw but two men in the back yard when Rogers received the blow; and that it was very dark in the back yard, there was no light from the windows, the night was dark and hazy, and there was no moon; that Rogers was a strong man, pretty good fighter, and a practiced athlete—a brave, game man—that he knew of no animostity between Rogers and any of the parties; and that during the fight between him (Reardon) and Kemp. nothing was said by Kemp to anyone, nor by anyone to

Kemp; that they (Reardon and Kemp) had about all they could do to attend to each other.

Angelina Johnson, a colored witness, who lived near by, says: "I was sitting up before the fire sleep. I awoke,'heard the noise, and went to the door and listened. I saw a man with a long ulster on running out of the lane, and he said, 'I have downed both of the sons of bitches. I know them both.' I did not hear the first of it. One of them said, 'Who are you, anyhow? Who are you? You son of a bitch, you are not going in here with us.'" This obviously explains the "other words" spoken by Rogers at or near Nannie Gale's back door, referred to by Reardon, but not given by him. It is, moreover, obvious, from all the testimony, that the person this witness saw running out of the lane, and who she heard say, "I have downed both the sons of bitches—I know them both," &c., was Whitehurst; though it is evident that this witness' account of what White-hurst said, does not agree with the statements made by White-hurst immediately afterwards in the presence of Murden, who was on the street, where he had remained, in front of the house of Nannie Gale; and it being clear that Whitehurst did not "down" but one person. Whether, in this respect, this colored witness was mistaken, is not material, nor is it necessary to notice further her statement, as it in no wise even tends to inculpate Kemp.

Witnesses were introduced on behalf of the accused, but it is not necessary to refer to their testimony further than to say, nothing was disclosed to the prejudice of the accused.

On this testimony the jury found the accused guilty of murder in the second degree, and ascertained the term of his imprisonment in the penitentiary at five years; and sentence was pronounced accordingly. Upon a writ of error to that judgment the case is here for review.

The principles of law bearing upon this case are plain and easily applied. The plaintiff in error was indicted, tried, and convicted for being present, aiding and abetting in the murder

of the deceased, the indictment alleging that the mortal blow
was struck by Charles L. Whitehurst.

· The well settled doctrine is, that a mere presence is not suffi-
cient; nor is it alone sufficient, in addition, that the person pre-
sent, unknown to the person who strikes the mortal blow, men-
tally approves what is done.    There must be something going
a little further; as, for example, some word or act.    The party
to be charged, "must," in the language of Cockburn, C. J., in
*The Queen* v. *Taylor*, C. C. R. 147, "incite, or procure, or en-
courage the act."    See, also, 1 Bish. Cr. Law, § 633, and nu-
merous authorities there cited.    Hence, in *State* v. *Hildrette*, 9
N. C. 440, it was held to be necessary, in order to make one an
aider or abettor, that he should do or say something, showing
his consent to the felonious purpose, and contributing to its ex-
ecution.  .

Mr. Bishop says, that "from the proposition that mere pres-
ence at the commission of a crime does not render a person
guilty, it results, that, if two or more are lawfully together,
and one does a criminal thing without the concurrence of the
others, they are not thereby involved in guilt.    But, however
lawful the original coming together, the after conduct may sat-
isfy a jury that all are guilty of what is done."    1 Bish. Crim.
Law, § 634.    And the same learned author says: "Even when
persons are unlawfully together, and by concurrent understand-
ing are in the actual perpetration of some crime, if one of
them, of his sole volition, and not in pursuance of the main
purpose, does a criminal thing in no way connected with what
was mutually contemplated, he only is liable."    "Thus," says
the author, "if in England, poachers join in an attack on the
game-keeper, and leave him senseless,—then, if one of them
returns and steals his money, this one alone can be convicted
of the robbery.    So, if two have committed a larceny together,
and one suddenly wounds an officer attempting to arrest both,
the other one cannot be convicted of this wounding, unless the
two had conspired, not only to steal, but to resist also, with ex-

treme violence, any who might attempt to apprehend them. The doctrine has been carried so far as to hold, that, where two join in an assault, and one commits *mayhem*, the other is not liable for the latter offence, unless he also intended to maim. But the correctness of this latter doctrine has been doubted, and, we think, properly." It is, however, in this case wholly unnecessary to push the doctrine to any extreme, or even beyond the proposition first stated, that "mere presence is not sufficient."

There is no room to doubt that the court below erred in refusing to set aside the verdict and grant a new trial. Indeed, the finding of the jury is so plainly unwarranted by any fact or circumstance disclosed by the evidence, that the court, unasked, ought, of its own motion, to have set aside the verdict, and ordered a new trial. As was said by Moncure, P., in *Reynolds' case,* 33 Gratt. 834, "the facts are so insufficient to sustain the verdict that, upon a demurrer to evidence, judgment ought to have been given in favor of the demurrant." There was in that case much more room for a verdict against the accused than there is in this. In that case, two persons were indicted jointly for murder, the fatal blow having been struck by one. The persons indicted were brothers, Burwell Reynolds and Lee Reynolds, who were members of a colored school near where the killing occurred. There was ill-feeling—a feud, so to speak—between the Reynoldses and the family of the deceased, growing out of the ducking of a younger brother of the deceased by the children of this school, for hallooing "school butter," in which ducking one of the brothers (Burwell Reynolds) took an active part. Altercations had subsequently occurred between the deceased and the Reynolds boys. There was evidence of threats *pro* and *con*, and the evidence was conflicting. The parties met near the place of the school, and deceased got into a difficulty with Lee Reynolds, the deceased commencing it, and during it Burwell Reynolds came up and gave the deceased a mortal stab with a knife. The evidence

was conflicting as to how the difficulty commenced. Lee Reynolds was tried separately, found guilty of murder in the second degree, and sentenced accordingly. In delivering the unanimous opinion of this court, reversing the judgment below, Moncure, P. said: "The prisoner certainly did not kill the deceased; nor do the facts certified show, or even tend to show, that he assisted in any way, or to any extent, in the said killing, nor to the act by which it was done, nor to its being done by any other act or any other person."

. It is impossible in this case, to read the evidence, and fail to see that this language of Judge Moncure. applies with greatly enhanced force here. In all the evidence in this case (and there is no conflict of evidence in any respect) there is not a circumstance disclosed tending in the least to show any agreement or formed design between the prisoner, Kemp, and the man, Whitehurst, who did the killing; nor between him and any other person or persons, nor that he in any manner aided or abetted in or assented to, the felonious act of Whitehurst, the sole perpetrator thereof: nor was there a moment of time in which there could have been an agreement between the real perpetrator and the prisoner. Nor is there an intimation of any agreement or design on the part of the prisoner to commit any other unlawful purpose. The testimony establishes nothing except the mere presence. .

The meeting of the parties who were present at this tragedy was purely accidental. The party of which the prisoner, Kemp, was one got to the house of Nannie Gale, rang the door-bell, and while apparently waiting for admittance, the deceased, Rogers, and his companion, Reardon, arrived, sought admittance by the same means, and failing, came down from the porch, went up the lane into the back yard, through a narrow dark passage way, some thirty feet long, to the back door of Nannie Gale's house, followed by Whitehurst, Kemp and Guy. It seems that up to this time not a word had passed there. Rogers seems to have turned upon the other party with the

coarsely insulting language: "You are not coming in here. You did not come with us, and you are not going in with us. Who are you, anyhow; who are you, you son of a bitch?" Here, too, as we must infer, Rogers struck Guy, in the language of the latter, as detailed by Murden, "a hell of a blow in the eye." Certain it is, that after a very brief absence Guy returned to the street where Murden had remained and told him about the blow he had received from Rogers; that Guy did not rejoin Whitehurst and Kemp during the fray, and that only Rogers, and Reardon, and Whitehurst, and Kemp were present when the killing occurred. It is also clear that, after getting back into the yard, the mortal blow was struck by Whitehurst with an axe belonging to Nannie Gale, and, during the fray accidentally found by the kitchen, where it had been left by the hired cook of Nannie Gale the previous evening; and that the prisoner had no knowledge that the axe was there, no knowledge of the murderous use of such an instrument by Whitehurst until after the fatal blow was struck, and in no way aided in or assented to its use.

It is important to observe, before leaving Reardon's statement, that in certain important particulars, it smacks too much of the incredible to be made the basis of safe judicial determination. He describes the night on which the killing occurred as a very dark, hazy night, and that there was no moon; and he says there was no light reflected from the windows. He, moreover, says that the passage-way between the kitchen and back door, at or near which the difficulty begun, was dark and narrow, being some thirty feet in length; yet, telling of the language used by Rogers to Whitehurst, Kemp and Guy, but omitting all mention of a blow given by Rogers to Guy, states that in that dark narrow passage-way he saw Whitehurst, Kemp and Guy each strike out at Rogers, but does not know that they hit him. Again, Reardon and Rogers were abreast of Whitehurst, Kemp and Guy, in that passage-way. How did they get out into the back yard? We can understand that Guy left imme-

diately on receiving the blow in the eye from Rogers; but this does not account for Reardon and Rogers getting back there. Reardon is the principal witness for the commonwealth. He does not pretend that Whitehurst and Kemp got by them in the passage-way and forced them out. Again, Reardon says when he got out at the end of the passage-way, Kemp struck him the first blow; that he and Kemp became immediately engaged in fight, and while thus clinched, and having as much as they could do to attend to each other, he, Reardon, saw Rogers a few feet distant and near the kitchen, there being a man near Rogers with uplifted hand; that he, Reardon, did not see what was held in the hand thus uplifted, nor did he see the hand descend, but in a moment heard a blow, a *thud,* and Rogers fell; that he had him taken into the house, and did not think he was much hurt. How Reardon could have seen these things in such darkness, and in such a situation as he describes, is past comprehension. The circumstances strongly tend to show that Rogers and Reardon turned upon Kemp and Whitehurst (after Guy had received the blow from Rogers, and retired), and forced them back into the back yard, where Whitehurst, who was doubtless being pursued by Rogers, found the axe, and with it struck the mortal blow. What the peculiar circumstances were under which he struck that blow, is something not explained. It is, however, indisputably established by the repeated statements of Whitehurst himself, to and in the hearing of several persons, that he did strike the fatal blow; and doubtless, but for the peculiar circumstances narrated, the offence thus committed would have been elevated to murder in the first degree. This is all the more plain in view of the fact that next morning, when light came, a pistol, as well as the axe, was found in the back yard. It is not proved who owned or had that pistol at the time of the killing. However, the enquiry most naturally forces itself upon the mind, was that pistol in the hand of Rogers when he received the blow that killed him? As to this there was no proof; had the matter been explained, it might most materially have

changed the result as to Whitehurst. However that may have been, there is absolutely no evidence, no circumstance, tending to criminate Kemp, as aiding or abetting, or in any way assenting to the crime, which was committed solely by Whitehurst. It is proper to say, however, that the evidence clearly discloses the fact that the unfortunate death of Rogers was the result, to some extent, of his own recklessness and folly, prompted, it is sad to say, so far as disclosed by the evidence, by no other or higher motive than a question of precedence in respect to admission to a bawdy-house.

The only other question raised by the record is as to certain instructions asked for by the prisoner and refused, and other instructions given by the court in lieu thereof. These are set forth in the prisoner's second bill of exceptions; but in view of the conclusion arrived at and above expressed, in respect to the question raised by the prisoner's bill of exceptions No. 1, it is unnecessary to pass upon the ruling of the court in respect to said instructions.

For the reasons above, the judgment of said corporation court must be reversed and annulled, the verdict of the jury set aside, and the case remanded to said corporation court for a new trial to be had therein in accordance with the foregoing reasons.

JUDGMENT REVERSED.