# Richmond.

## PATRICK H. SHIFLETT v. COMMONWEALTH.

### November 15, 1928.

### Absent, Chichester, J.

The opinion states the case.

*John S. Chapman* and *Chas. A. Hammer*, for the plaintiff in error.

*John R. Saunders*, Attorney-General, *Leon M. Bazile* and *Edwin H. Gibson*, Assistant Attorneys-General, for the Commonwealth.

WEST, J., delivered the opinion of the court.

Patrick H. Shiflett was convicted and sentenced to serve a term of twenty years in the penitentiary for being present, counselling, aiding, abetting and assisting Dewey Shiflett, his son, in killing and murdering one Bluford Johnson. The verdict of the jury reads as follows: "We the jury find the prisoner guilty as principal in the second degree of murder in the seeond degree as charged in the indictment and fix his punishment at twenty years in the State penitentiary." Patrick H. Shiflett is here complaining.

The material evidence, and the inferences which may be properly drawn therefrom, tend to prove the following facts.:

Dewey Shiflett, the fifteen year old son of Patrick H. Shiflett, shot and killed Bluford Johnson in the front

room of the home of Millie F. Shiflett, his wife's mother, where Johnson resided, in Greene county, Virginia, on November 11, 1927. Patrick H. Shiflett, the plaintiff in error, contended in the lower court that he was not present when his son killed Johnson, but had left the room in which the accused and Johnson had engaged in an assault, and gone under the steps to the front porch of the Shiflett home, and there remained until the shooting was over.

The Commonwealth contended that the accused was not under the porch at the time Johnson was killed, but was present aiding, counselling, encouraging and abetting his son, Dewey, in the commission of the murder.

The Shiflett home on the first floor consisted of a small combined kitchen and dining room adjoining and communicating by door with the front room, which opened on the front porch; and there was a back door in the cook room leading to the back yard of the premises.

On account of alleged intimacy between Patrick H. Shiflett and Johnson's wife, Johnson and wife separated and Mrs. Johnson went to the home of her sister at Earlysville, some eighteen miles away, just three days before Johnson was killed.

Patrick H. Shiflett arrived at Millie F. Shiflett's home about three o'clock in the afternoon. Dewey Shiflett came about one hour later. Still later, when Johnson came, Dewey left and went home. Johnson and Patrick H. Shiflett were seated in the cook and dining room, and began to discuss Patrick's attentions to Johnson's wife. Mrs. Johnson had told Patrick that her husband had said he was going to kill him if he came around him, and that his boy had better not come over to Millie Shiflett's house with him. Pat-

rick said to Mrs. Johnson: "Mr. Johnson can whip me, or I will whip him." Dewey was a fifteen year old boy, and there is no proof that he had any motive or provocation to kill Johnson.

Johnson and Patrick H. Shiflett did not talk very long before they engaged in a fight, in which Johnson got Patrick down and was on top of him. Johnson let Patrick get up and a few minutes later they engaged in a second fight. Mrs. Millie Shiflett went on the porch and called Dewey, who was on his father's store porch about 250 yards away, to "come back," "they were fighting." Dewey got his father's Smith & Wesson pistol from the store and came over. When he arrived Johnson had gotten off of Patrick and gone into the front room to get his gun. Johnson told Dewey not to come in on him. Dewey went in and followed Johnson into the back room.

Mrs. Millie F. Shiflett had left Patrick in the cook and dining room. After she got into the front room and Dewey and Johnson had gone into the back room, she heard fighting back there and in a few minutes Johnson and Dewey returned to the front room. Just before the firing began in the front room, Mrs. Shiflett jumped into the dog house on the front porch for protection from the bullets. While she did not see Patrick when she left the front for the dog house, she heard "walking and noise" in the back room, where she had a few minutes before seen the accused. After the firing ceased, she went into the front room. Johnson was lying on the floor and Patrick and his son, Dewey, were standing by his dead body. Patrick told her that his son "had to do it." Neither father nor son made any further explanation of how Johnson was killed.

On November 10, 1927, the day before the shooting, Patrick had purchased a box of fifty, size thirty-two,

cartridges, at a store in Charlottesville, and Dewey used some of these cartridges to kill Johnson. While Dewey had neither motive nor provocation to kill Johnson, Patrick had both. Johnson was interfering with his friendly relations with Johnson's wife, and, besides, had said he was going to kill Patrick. Dewey knew his father was in the house where Johnson lived and it seems unbelievable that Dewey, a boy of fifteen years, who had no motive or provocation to kill Johnson, would go into the latter's home and engage in a gun battle with him except for the fact that he knew he would have the encouragement, sympathy and, if necessary, the active assistance of his father in the conflict. How can the presence of Patrick with his son at the dead body of Johnson so soon after the fatal shot was fired be explained, except it be that he was present aiding and abetting his son in the commission of the crime?

It is true that the accused testified that he went out the back door, around the house and under the front porch while the shooting was being done; and his father, Nimrod Shiflett, who was on the porch of a house about 250 yards away, testified that he saw the accused go under the front porch. But Mrs. Millie Shiflett, who was at the front porch, says he did not go under the porch. Besides, the jury visited the scene of the crime and had the accused go from the back door to the place he says he occupied under the front porch, and also went to the place his father was when he said he saw the accused go under the porch, and found against the evidence for the accused on this point. They must have been convinced that the testimony of the accused was false. Had they believed it to be true, they would have found him not guilty. If the accused was not under the porch, his alibi must

fail, as he offers no other evidence of his whereabouts while the gun battle was in progress.

His alibi being false, he must have been where the facts and circumstances shown in evidence place him, either actually or constructively present, aiding or encouraging his son, Dewey, in the commission of the crime. While mere presence at the commission of the crime is not sufficient to sustain the charge of aiding and abetting the principal in its commission, yet to be thus present and give encouragement is a participation in the crime.

In *Brown* v. *Commonwealth*, 130 Va. 736, 107 S. E. 810, 16 A. L. R. 1039, the court said: "Mere presence when a crime is committed is, of course, not sufficient to render one guilty as aider or abettor. There must be something to show that the person present and so charged, in some way procured, or incited, or encouraged, the act done by the actual perpetrator. *Kemp's Case*, 80 Va. 443, 450. But whether a person does in fact aid or abet another in the commission of a crime is a question which may be determined by circumstances as well as by direct evidence."

In the instant case, as in *Bonner's Case*, 141 Va. 400, 126 S. E. 198, the accused relied on the defense of an alibi, which was interposed at the trial. In that case, Judge Sims, speaking for the court, said: "In this case, the testimony introduced on behalf of the accused on the trial, attempting to account for her movements and whereabouts, was in absolute conflict with the testimony for the Commonwealth on the subject. Both could not be true. Further, the defense of an alibi was not asserted when it could have been first made, and not until the trial; and this delay is not explained. And since the jury found the accused guilty, it found in effect that the attempt of the accused to set up an

alibi on the trial was on afterthought and contrivance to defeat the ends of justice."

■■ The verdict of the jury is not contrary to the law. The credibility of the witnesses and the weight to be given their testimony were questions for the jury and their verdict is sufficiently supported by the evidence.

The first assignment of error, that the verdict is contrary to the law and the evidence, is without merit.

■■ The remaining assignment of error is based upon the action of the court in directing a change in the form of the verdict.

The jury first returned a verdict in the following words: "We, the jury, find the defendant guilty as charged in the indictment and fix his punishment at twenty years in the State penitentiary."

Upon the motion of counsel for the Commonwealth, that the form of the verdict be so changed as to show the grade of the offense of which the prisoner was found guilty, the court directed the jury to return to their room and change the verdict to read that the defendant is guilty as principal in the second degree, and whether for murder in the first or second degree.

The court, in reply to the inquiry of a juror: "Do you want the verdict written on the indictment?" said: "Yes, but I do not prescribe the verdict which you should write on it." They returned the verdict in the form in which the final judgment was entered upon it, *supra*.

We find no prejudicial error in the action of the court in this matter. The first verdict fixed the accused's punishment at twenty years in the penitentiary, and the verdict in its final form fixed his punishment at twenty years. There was no change in the substance, but only in the form of the verdict. Of this the ac-

cused cannot complain. The law makes it the duty of the court to see that the verdicts of juries are put in proper form.

Upon the whole record, we find nothing to warrant us in disturbing the judgment of the trial court, and the same will be affirmed.

*Affirmed.*