## OLIN ANDERSON v. STATE.

No. A-9473. June 16, 1939.

(91 P. 2d 794.)

Eaton & Eaton, of Okmulgee, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Jess L. Pullen, Asst. Atty. Gen., and L. A. Wallace, Co. Atty., of Okmulgee, for the State.

BAREFOOT, J. The defendant was charged jointly with Jimmie Goff with the crime of murder, in Okmulgee county. A severance was taken; Jimmie Goff was tried, convicted, and sentenced to serve a life term in the penitentiary. The defendant was tried, convicted of manslaughter in the first degree, and his punishment left to the court, who sentenced him to serve 20 years in the penitentiary, and he has appealed.

Several assignments of error are presented in this case. The conclusion we have reached shall cause us to consider but one of these assignments. Others will be referred to as occasion demands. Did the court err in overruling defendant's demurrer to the evidence, and in refusing to instruct the jury to return a verdict of not guilty? The consideration of this error requires us to review the testimony as shown by the record.

On the night of June 19, 1937, the defendant, Olin Anderson, Jimmie Goff, Louise Smith, May Ethel Ragsdale, and James Cravatte, who were negroes, residing in Okmulgee, left the home of Louise Smith, in an automobile for the purpose of attending a dance and picnic about two and one-half miles southeast of Beggs, in Okmulgee county. They arrived there about 11 o'clock p. m. Some 200 people were in attendance, and the dance platform was the main attraction. Several crude cold drink stands had been erected in close proximity to the dance platform, and the lighting system was composed of bottles filled with kerosene with

rags stuffed therein and lighted. Soon after arriving upon the picnic grounds, defendant and Louise Smith danced one set. A man by the name of Tony Williams, whose nickname was "Tangle-eye," was managing the dancing platform. The defendant, after dancing, purchased a pint of liquor, and with his party, Jimmie Goff, Louise Smith, and May Ethel Ragsdale, returned to defendant's parked automobile and there drank the whisky. The two men returned to the dance platform and the girls followed them. Some words were had between defendant and the floor manager, Tony Williams, or "Tangle-eye," and the witness Williams testified that he spoke to defendant about getting off the platform, which was crowded, and attempting to lead him off, and defendant saying, "he would be back." Defendant testified that when asked to get off the platform, which was for the dancers, he merely said: "I am going to dance myself." There was not much of a controversy according to the evidence of either Williams or the defendant. A short while after this some words were had between the witness Williams and Jimmie Goff, who had come to the dance with defendant, and Goff immediately drew a gun from his bib-overalls and struck the witness Williams, or "Tangle-eye," over the head and began to fire the pistol indiscriminately into the crowd, with the result that three innocent bystanders were killed. One of them, a man by the name of John Grayson, and two young girls.

There is no evidence that defendant participated in any way in the shooting, and not a line of evidence as to any conspiracy between the defendant and Jimmie Goff, or that the defendant had any knowledge that the shooting was to occur. The facts tending to connect the defendant with the crime will be hereafter related. Immediately after the shooting, defendant, as did all others, ran from the scene of the shooting. When defendant returned to his parked automobile, he found all the other parties there, including Jimmie Goff, who had done the shooting, and who was attempting to move the car, but was having trouble

in doing so, by reason of the congested condition of cars and trees. That defendant, at the request of the other parties, assumed control of the car and drove toward Okmulgee. Two of the parties, May Ethel Ragsdale and James Cravatte, were let out at their homes. At the request of Jimmie Goff, defendant and Louise Smith took him to the home of his uncle near Boynton, where they arrived early in the morning and stayed the balance of the night. The next day, being Sunday, they procured a paper to see if any one had been injured by reason of the shooting at the dance. They returned to Okmulgee in the afternoon. The defendant was taken into custody by the sheriff, and questioned. At first he denied knowing anything about the killing, but after some time he told the sheriff he would tell him something "if he would treat him like a white man." The sheriff made him that promise, and he then told the sheriff that he was present at the time of the shooting, and that Jimmie Goff had fired the shots that killed the three innocent bystanders. He also told the sheriff where the gun was, which belonged to him, and with which Jimmie Goff had done the shooting. He also assisted the sheriff in securing the same. Upon making this statement he was released by the sheriff and attended the preliminary hearing of Jimmie Goff for the purpose of giving his testimony, when Jimmie Goff waived his preliminary hearing. Afterwards he was charged jointly with Jimmie Goff with the crime of murder of John Grayson, one of the parties who was killed on the night of June 19, 1937.

The state introduced as state's witnesses both Louise Smith and May Ethel Ragsdale. These two witnesses corroborated the testimony of the defendant in almost every detail. They both testified that when they left home, Jimmie Goff had possession of defendant's gun, with which the killing was done; that they saw him in possession of it at various times during the evening; that defendant was never seen by them in possession of the same at any time; that they were on the platform at the time of the shooting;

that defendant did nothing to aid, abet or assist Jimmie Goff at any time, nor did he in any way participate in the shooting. They both testified that defendant did not leave the dancing platform after they returned from the automobile, and that defendant danced three sets with Louise Smith prior to the time the shooting occurred, and was there present at the time, and they saw him run just as did all the other parties.

The witness James Cravatte, who was with the parties during the time before they left Okmulgee, and on the trip to the dance, saw Jimmie Goff with the gun, and he held it for him on two different occasions, while Jimmie Goff cranked the automobile.

The only witness whom the state produced that in any way connected the defendant with the gun was a negro boy named Chester Lewis, who testified that just a few minutes before the shooting started he saw two negroes standing at a pop stand near the dancing platform, one wearing trousers, and the other bib overalls. (This was the way defendant and Goff were dressed.) He saw the one dressed in trousers load a pistol and hand it to the one dressed in overalls. This testimony occurs to us as unusual to say the least, in view of the other testimony in this case. In the first place, it is directly contrary to the two chief witnesses for the state, Louise Smith and May Ethel Ragsdale, who both swore that defendant did not leave the platform after they returned from the automobile. At the trial of this defendant, this witness positively identified this defendant as being the one who loaded the pistol and handed it to the party wearing the bib overalls, and whom he could not identify and did not know. Yet the testimony of two jurors was introduced in evidence by the defendant who had been on the jury the day before, which tried the defendant Jimmie Goff, and both swore that in that trial the witness testified that he did not know either of the defendants.

His testimony on direct examination was as follows:

"Q. (Handing gun to witness) Just show about what position he walked up to the stand and held the gun in? A. He was standing just in this direction, and he was putting shells in this way. (Indicating) Q. All right, sit down. Did you know who handed the fellow in overalls the gun? A. No, sir. I didn't know him. Q. Never saw him before? A. No, sir, I never have seen him. Q. How was he dressed? A. He had on pants and a shirt. Q. He was not dressed in overalls? A. No, sir."

The state attempts to rebut this fact on cross-examination of these witnesses that he was not asked to identify the defendant, but merely stated that he did not know him. But the record in this case, where the defendant was on trial, reveals that when this witness was called by the attorneys for the state, on direct examination he was at no time asked to identify this defendant, but at all times stated that he did not know him. After the direct and cross-examination had been completed, a juror asked permission to question the witness, and in answer to the juror's question, the witness identified defendant as the party whom he saw load the gun and hand it to the defendant Jimmie Goff. It is passing strange that if this witness was able to identify the defendant, counsel representing the state would have closed his evidence in chief, and permitted him to leave the witness stand without making this identification. It seems that his testimony was even a surprise to the attorneys representing the state. He further testified that the shooting was about 5 or 10 minutes from the time he saw the gun loaded and handed to the other party. He did not witness the shooting, but heard the shots fired. This witness, it seems, had told the sheriff about this matter, and while on the witness stand the court permitted the attorneys for the state to go into detail as to his conversation with the sheriff, with reference to what he had told him. This was improper testimony. It is one of the errors assigned. If this was the only error in the case, and the evidence was sufficient to justify a conviction of defendant, we would hold that it was not prejudicial, but it was improper. This witness should have been permitted

to give his own testimony, but should not have been permitted to testify in detail just how he had related it to the sheriff. This was an attempt on the part of the state to bolster it up and give it more weight before the jury. The defendant was not present at the time of this conversation. Even if this testimony were true, it is doubtful, under the law, as to whether it would be sufficient to connect the defendant as a principal in this case, where not a line of testimony was shown that a conspiracy, or a prearranged plan had been entered into between the defendant and Jimmie Goff to kill or murder. No evidence to show that defendant spoke to the party or did or said anything indicating an intention to kill or murder anybody, or to even do bodily harm; and the further fact that the testimony of the state's own witnesses was that he did not raise his hand or do a single act to aid or abet or assist the said Jimmie Goff at the time of the actual killing.

This case involves the construction of the statute defining "aiding and abetting," Oklahoma Statutes 1931, section 1808; Oklahoma Statutes Annotated, title 21, section 172, which is as follows:

"All persons concerned in the commission of crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, are principals."

One of the first cases decided by this court was in an opinion by Judge Richardson, in the case of Moore v. State, 4 Okla. Cr. 212, 111 P. 822, 824, which has been cited, and the principle announced therein adhered to in many cases. It is there said:

"To constitute one a party to a crime under this statute, it is necessary that such person be concerned in the commission of the offense; that is, that he either commit it or aid or abet its commission—and it is not sufficient that he merely acquiesce therein. Consenting and acquiescing are mere mental acts, which, unless communicated to the perpetrator of the offense, in no manner aid or abet him in its perpetration. To be concerned in

the commission of crime, one must either commit the crime himself, or procure it to be done, or aid or assist, abet, advise or encourage its commission. But a mere mental assent to or acquiescence in the commission of a crime by one who did not procure or advise its perpetration, who takes no part therein, gives no counsel and utters no word of encouragement to the perpetrator, however wrong morally, does not in law constitute such person a participant in the crime. Drury v. Territory, 9 Okla. 398, 60 P. 101; Pearce v. Territory, 11 Okla. 438, 68 P. 504; White v. People, 81 Ill. 333; Jones v. People, 166 Ill. 264, 46 N. E. 723; Clem v. State, 33 Ind. 418; State v. Orrick, 106 Mo. 111, 17 S. W. 176, 329; Burrell v. State, 18 Tex. 713; People v. Ah Ping, 27 Cal. [489], 490; People v. Woodward, 45 Cal. 293, 13 Am. Rep. 176; Walrath v. State, 8 Neb. 80; Kemp v. Commonwealth, 80 Va. 443; Butler v. Commonwealth, 63 Ky. (2 Duv.) 435; State v. Hildreth, 31 N. C. [9 Ired.] 440, 51 Am. Dec. 369; Connaughty v. State, 1 Wis. 159, 60 Am. Dec. 370."

This case was followed by Polk v. State, 26 Okla. Cr. 283, 224 P. 194, 206, where it is said:

"It may be stated as a general proposition that no one can be properly convicted of a crime to the commission of which he has never expressly or impliedly given his assent. To hold otherwise would be contrary to natural right and shocking to every sense of justice and humanity. When the accused is present and aiding and abetting another in its commission he may be considered as expressly assenting thereto, so, where he has entered into a conspiracy with others to commit a felony or other crime under such circumstances as will, when tested by experience, probably result in the unlawful taking of human life, he must be presumed to have understood the consequences which might reasonably be expected to flow from carrying into effect such unlawful combination, and also to have assented to the aiding of whatever should reasonably or probably be necessary to accomplish the objects of the conspiracy, even to the taking of life. But further than this the law does not go; for if the accused in such case has not expressly assented to the commission of the crime, and the unlawful enterprise is not of such character as will probably involve the necessity of taking life in carrying it into execution, there can be no implied assent, and

consequently no criminal liability. The mere presence of the accused at the scene of the homicide does not make him a criminal; he may have known that a crime was committed, yet, if he did not participate in it directly or indirectly, or encourage the party doing the killing, his mere presence would not constitute him a principal in the transaction or connect him criminally with the killing. Moore v. State, 4 Okla. Cr. 212, 111 P. 822."

Other cases involving the issues here involved are: Scott v. State, 13 Okla. Cr. 225, 163 P. 553; Holmes v. State, 6 Okla. Cr. 541, 119 P. 430, 120 P. 300; Crabtree v. State, 18 Okla. Cr. 125, 193 P. 1005; Thompson v. State, 14 Okla. Cr. 209, 169 P. 1125; Carrico v. State, 16 Okla. Cr. 118, 180 P. 870; Vann v. State, 21 Okla. Cr. 298, 207 P. 102; Weatherholt v. State, 9 Okla. Cr. 161, 131 P. 185.

In a case before the Territorial Supreme Court, prior to statehood, the facts were much stronger against the defendant than in the case at bar. We will not lengthen this opinion by giving those facts, but desire to give the reasoning of the late Chief Justice Burford, in reversing that case, and construing the identical statute here under consideration. It was in the case of Drury v. Territory, 9 Okla. 398, 60 P. 101, 107. In that case the court said:

"In order to convict the defendant of the crime charged, it was not sufficient to prove that he was present at the commission of the crime, but, in the language of our statute, he must 'aid and abet in its commission.' In the case of Clem v. State, 33 Ind. 418, the trial court instructed in part as follows: 'So, if the murder was perpetrated with her knowledge and consent or connivance, she is a principal.' The Supreme Court said: ' "Consent," as a substantive, is a synonym of "assent," "acquiescence," "concurrence," and means an agreement or harmony of opinion or sentiment, and so it would here be popularly understood. It does not imply any manifestation or expression of such concurrence, though this may sometimes be inferred from the connection in which the word is used. There was, however, nothing here to suggest this implication. It could exist without act or utterance, and entirely without the knowledge of the actual perpetrator of

the homicide, and in that case it would neither aid nor encourage him to do the fatal deed, and short of this there cannot be aiding or abetting in the sense which the law requires to constitute guilt as a principal in the second degree. Under this instruction, the jury would understand that, if they believed from the evidence that the prisoner was present when the murder was committed, and was willing or desirous that the bloody deed should be done, they must find her guilty, though that desire had been kept by her a secret, and was entirely unknown to him who inflicted the deadly blow. It is plainly not the law that one can be guilty of murder, without overt act, who by neither word nor gesture has done anything to contribute to the commission of the homicide, or to assist, encourage, or evince approval of it at or before the fact, and of whom it only appears that he was present, and knew of the crime, and mentally approved it. The silent thought, however wicked in view of the Searcher of Hearts, is not a crime against our laws, but is left by them to another than a human tribunal.' It is not sufficient to show that the defendant was present, and knew the offense was being committed. The proof must go further, and show, beyond a reasonable doubt, that he was participating in the homicide before or at the time of its commission. Wade v. State, 71 Ind. 535. 'There is a plain distinction between consenting to a crime and aiding and abetting in its perpetration. Aiding and abetting are affirmative in their character; consenting may be a mere negative acquiescence, not in any way made known to the principal malefactor. Such consenting, though involving moral turpitude, does not come up to the meaning of the words of the statute.' White v. People, 81 Ill. 333."

14 Am. Jur. p. 826, sec. 87, lays down the general rule, as follows:

"To constitute a person a principal in a crime he must be present aiding by acts, words, or gestures and consenting to the commission of the crime. It is not necessary, however, that he do some act at the time in order to constitute him a principal, but he must encourage its commission by acts or gestures, either before or at the time of the commission of the offense, with full knowledge of the intent of the persons who commit the offense. The mere concurrence of the minds of persons in pursuance

of a previously formed design to commit a crime does not alone constitute them principals. To constitute a principal in crime, there must be participancy or the doing of some act at the time of the commission of the crime which is in furtherance of the common design."

Many cases from other jurisdictions are cited in the note of 12 A.L.R. 277. See, also: Goins v. State, 46 Ohio St. 457, 21 N. E. 476; Landrum v. Commonwealth, 123 Ky. 472, 96 S. W. 587; Woolweaver v. State, 50 Ohio St. 277, 34 N. E. 352, 40 Am. St. Rep. 667.

We have carefully examined this record. It may be true there is some conflict in the evidence on some facts involved in this case. But even conceding that the evidence was true, as before stated, we are of the opinion it is insufficient to justify the conviction of this defendant as a principal under the law. There is no proof of a conspiracy or prearranged plan between the defendant and his co-defendant Goff, to murder, kill or even do bodily harm to any person. No word spoken at the time of the actual shooting, and no participation by the defendant in any way to aid, abet or even to assist the said Goff in his action. The evidence of one witness on rebuttal, that defendant had possession of the gun prior to reaching the picnic grounds, and of the witness Chester Lewis, is so contradicted, and doubtful, that little weight can be given thereto. It is unfortunate that in the twinkling of an eye three innocent persons should have been rushed into eternity, but it is fortunate that the one who, in a crazy drunken moment, caused this, is now paying the penalty. This defendant should not be required to suffer the punishment assessed against him unless the evidence and the law fully warranted and justified the same. His plea when he told the sheriff "Will you give me the same fair treatment as a white man?" rings true. The sheriff of Okmulgee county was attempting to solve the murder mystery. The defendant was in custody. He agreed to tell the sheriff who had committed the act, and his request was that "he be treated as a white

man," was an expression of his belief in the right, if he told the truth and ended the mystery as to who had committed the act. The sheriff of Okmulgee county evidently had the same idea. He released the defendant, and he was present ready to testify at the preliminary hearing of the defendant Jimmie Goff. It was afterwards that the county attorney filed this charge against him and he was tried and convicted. We are of the opinion the evidence did not justify his conviction, and the court erred in refusing to instruct the jury to return a verdict of not guilty.

It is, therefore, ordered that the judgment of the district court of Okmulgee county be reversed.

DOYLE, P. J., and DAVENPORT, J., concur.