OLIN ANDERSON v. STATE.

No. A-10138. April 14, 1943.

(137 P. 2d 254.)

Joe S. Eaton and James K. Eaton, both of Okmulgee, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Jess L. Pullen, Asst. Atty. Gen., and Jack Pitchford, County Atty., of Okmulgee, for defendant in error.

BAREFOOT, J.   Defendant, Olin Anderson, was charged in the district court of Okmulgee county with the crime of murder, was tried, convicted of manslaughter in the first degree, sentenced to serve a term of 15 years in the penitentiary, and has appealed.

Defendant was jointly charged with one Jimmie Goff with the crime of murder of John Grayson, at or near Beggs, in Okmulgee county, on the night of June 19, 1937. A severance was granted and his codefendant, Jimmie Goff, was tried, convicted and sentenced to a term of life imprisonment in the State Penitentiary, which he is now serving.

Defendant was later tried, convicted of manslaughter in the first degree and sentenced to serve 20 years in the penitentiary. He appealed to this court and on the 16th day of July, 1939, his case was reversed for the reason that the evidence was insufficient to sustain the judgment and sentence.   Defendant was again tried, convicted of manslaughter in the first degree and sentenced to serve 15 years in the State Penitentiary, and this case is an appeal from that judgment and sentence.

Pending his first appeal, defendant executed a supersedeas bond, and was at liberty.   Since the date of his second conviction, June 13, 1941, he has been confined in the penitentiary of this state at McAlester, unable to make bond.

The first appeal is reported in the case of Anderson v. State, 66 Okla. Cr. 291, 91 P. 2d 794. The facts are fully stated in that case, and it will be unnecessary to review them here. It will only be necessary to consider the new evidence that may have been developed at his second trial.

The evidence at the second trial is practically the same as that of the first, with the exception that the co-defendant, Jimmie Goff, who had been convicted and is serving a life sentence in the State Penitentiary, was brought by the state and used as a witness in this case. That part of his evidence which is material as against this defendant is as follows:

"Q. After you got up there, what did you do? Did you dance yourself? A. No, sir, I didn't. After we got up there, Olin bought two pints of whisky and we drank one and a half. Q. Who drank out of this bottle,—the first pint he bought? A. Myself, Olin Anderson, Louise, Ethel Ragsdale, and James Cravatte. Q. Where did you drink this whisky? A. At the end of the platform. Q. You drank out of a pint bottle? A. Yes, sir, I did. Q. And you say you had the second pint later? A. We did. Q. Who furnished the whisky? A. Olin Anderson. Q. Who paid for the whisky when you were down at this Frances Smith's home? A. Olin Anderson. Q. Did you have a pistol with you? A. I didn't. Q. Did Olin Anderson have a pistol? A. He did. Q. Did you later see the pistol? A. I did. Q. What kind of a pistol was it? A. A .38. Q. What make pistol? A. I don't know, sir. Q. Was it a long or short barrel? A. Seems it was a long barrel. I am not much of a judge. Q. Where did you first see that pistol? A. You mean after we arrived at the picnic? Q. Yes. A. He had it in his pocket. Q. He carried it up there with him? A. Yes, sir. Q. Did you later see the pistol on the picnic grounds? A. Yes, sir, I did. Q. Tell the jury about that. A. After we drank the last whisky he bought, Olin Anderson gave me

the rest of the whisky and the pistol. Q. How much whisky was in the bottle? A. Half pint. Told me he was going to dance and said he would give me the whisky and the pistol. Q. What did you do with the whisky and the pistol? A. I put the whisky in my pocket and the pistol in the bib of my overalls. Q. Then what did you do? A. I walked out northwest of the platform, and stood out there under a tree, northwest of the platform, and after being out there a few minutes later, he came out where I was and asked me if I had any more whisky and I told him yes, and he says, 'Let's drink it,' and then he asked me for the pistol, and I pulled it out and he loaded it. Q. When did he hand you the pistol? A. When we were drinking this whisky. Q. Did you know why he handed you the pistol? A. No, not at the time. Q. Did he say why he wanted you to hold the pistol? A. He didn't. Q. You took the pistol? A. I did. Q. You drank this half pint of whisky? A. Yes. Q. What did you do with the pistol? A. I put the pistol back in my bosom after he gave it back to me. Q. Under the bib of your overalls? A. Yes, sir; under the bib of my overalls. Q. Did you go over near this stand which was located north of the platform? A. I don't remember whether we went over that way or not. Q. Then later what happened in the way of him calling for the pistol or you handing him the pistol? Tell the jury about that. A. He asked me for the pistol after we drank the whisky, and he taken the pistol and loaded it and handed me the pistol back, and told me about him and Tang having a little trouble. Q. Who was Tang? A. I don't know. Q. Is that the fellow they called 'Tangle-Eye'? A. Yes, sir. Q. Did you later learn his correct name was Tommy Williams? A. I don't remember. I don't know anything about him. Q. Do you know whether he was the man in charge of the dance platform? A. I don't. Q. You handed Olin Anderson the pistol; then what happened? A. He gave it back to me after he loaded it. Q. How many shells did he put in the pistol? A. I don't know. Q. You saw him put some shells in the pistol? A. Yes, sir. Q. And handed it back to you? A. Yes, sir. Q. What did he

say when he handed the pistol back to you? A. He said he and Tang had had a few words, and I asked him what it was about and he said something about dancing, and he says, 'Let's go back up on the platform,' and I said, 'All right,' and did go with him. After we got up there, Tangle-Eyes says to Olin, 'I asked you to get off the platform,' and Olin says, 'To hell with him,' and I hit him, and Olin says, 'Shoot the son-of-a-bitch!', and I did. Q. When you first hit him over the head with the pistol, where was the pistol when you pulled it out? A. In the bib of my overalls. Q. Where was Tang, or Tommy Williams, standing on the platform when you first hit him? A. On the northeast corner. Q. You hit him over the head with the pistol? A. Yes, sir. Q. How many times? A. One. Q. Then what did he do? A. Throwed his hands over his face and run through the crowd. Q. Which way did he run from the platform? A. Northeast, as I remember. He just cut off and run through the crowd. I couldn't tell much which way he was going. Q. Then what did you do? A. I just throwed it up and shot it, as far as I can remember. Q. How many times did you shoot it? A. Three times, that I can remember. Q. Then you went immediately to the car? A. We did."

It is first contended by the defendant that after the reversal of this case by reason of the insufficiency of the evidence, the state did not have the right to retry him, and he should have been discharged.

This contention is based on section 3205, O. S. 1931, Tit. 22 Okla. Stat. Ann. 1941, § 1067, which is as follows:

"When a judgment against the defendant is reversed, and it appears that no offense whatever has been committed, the Criminal Court of Appeals must direct that the defendant be discharged; but if it appears that the defendant is guilty of an offense although defectively charged in the indictment, the Criminal Court of Appeals must direct the prisoner to be returned and delivered over to the jailer of the proper county, there to abide the order of the court in which he was convicted."

In reversing the first case, the following language was used by this court [66 Okla. Cr. 291, 91 P. 2d 799]:

"We are of the opinion that the evidence did not justify this conviction, and the court erred in refusing to instruct the jury to return a verdict of not guilty.

"It is, therefore, ordered that the judgment of the district court of Okmulgee county be reversed."

It would have been the better practice for us to have stated in that opinion that the case was reversed and remanded for a new trial, if in the opinion of the county attorney he had sufficient evidence other than was offered in the first trial, to sustain a conviction of the defendant, otherwise the defendant be discharged. Williams v. State, 61 Okla. Cr. 396, 68 P. 2d 530; Id., 68 Okla. Cr. 348, 98 P. 2d 937.

The only case cited and relied upon by defendant to support his contention is the case of Harmon v. Territory, 9 Okla. 313, 60 P. 115. That case was decided by the Territorial Supreme Court on February 7, 1900. In the statement of the facts, it is said:

"This is an indictment found by the grand jury of Payne county in November, 1895, charging the defendant, Henry Harmon, with an assault upon one Daisy Yantis with the intent to commit the offense of rape. The defendant was tried and convicted, and sentenced to five years in the penitentiary. An appeal was taken to the supreme court, and in January, 1897, the case was reversed and remanded. * * * The remanding order contained no instructions about the granting of a new trial.

"On November 23, 1897, the case was called up in the district court. The defendant objected to going to trial for the reason that, as the remanding order contained no instructions that the district court should grant a new trial, the district court had no power to do so, and try the case. This objection was overruled by the court. The defendant withdrew his plea of not guilty, and filed a

demurrer. The court overruled the demurrer, and the cause was continued for the term."

In passing upon this issue, the court used the following language:

"The first assignment of error on which it is alleged by counsel for plaintiff in error that this cause should be reversed, is that it was improper for the district court to grant a new trial, and retry this cause, for the reason that the mandate or remanding order from the supreme court contained no specific instructions to that effect. We think it is the law that the mere remanding of a case to the district court by the Supreme Court, where the case is reversed by reason of the admission of improper testimony, or the rejection of competent and legal testimony, or for errors occurring during the trial, is sufficient authority for the district court to retry the case, as the intention of the supreme court that this should be done is manifest by the mere remanding of the case. And we think it was not error for the district court to retry this case under the circumstances as shown by the records."

The court did not pass directly upon the question where the reversal was by reason of the "insufficiency of the evidence." But we have examined many authorities bearing upon this question, and have come to the conclusion that the court had the right to enter an order for the retrial of defendant, under the circumstances in this case, and that the overruling of the motion filed by defendant was not error. 24 C.J.S., Criminal Law, § 1952, pages 1135 and 1136; Kitchen v. State, 61 Okla. Cr. 435, 69 P. 2d 411; Id., 66 Okla. Cr. 423, 92 P. 2d 860.

In 24 C.J.S., Criminal Law, § 1952, it is stated:

"It is not a prerequisite to a new trial after reversal that the mandate specifically direct it; it may be had where the grounds of reversal and the general directions in the mandate impliedly indicate the intention of the appellate court to grant a new trial." Citing People v.

Ballard, 13 Cal. App. 511, 110 P. 351; State v. Clouser, 72 Iowa, 302, 33 N.W. 686.

The next question presented is, Was the evidence offered at the second trial substantially different from the evidence offered at the first trial, where it was held that it was insufficient to sustain the judgment and sentence, and of such weight and credit that the present judgment and sentence can be sustained by reason thereof?

In our former opinion we have fully discussed the evidence and applicability of the statute (sec. 1808, O. S. 1931, Tit. 21, Okla. Stat. Ann. 1941 § 172) with reference to "aiding and abetting." Many cases are cited in that opinion, and a re-reading of them clearly demonstrates that they fully state the law with reference to when one may and does become a principal under our statute by aiding or abetting another in the commission of crime. It therefore becomes unnecessary to further discuss this question or cite further decisions. It is only necessary to briefly refer to the facts as testified to by the witness Jimmie Goff, whose testimony has heretofore been set forth.

We are mindful of the rule that has so often been announced by this court that a verdict of a jury will not be set aside by this court where there is a conflict of the evidence of the state and the defendant, and where the evidence of the state is sufficient to sustain the judgment and sentence that the same will not be set aside on appeal. Also the familiar rule that the credibility of the witnesses and the weight to be attached to their testimony is a question of fact for the jury. A strict application of this rule would require an affirmance of this case. The question is, Do the facts here justify a strict application of these rules?

With reference to the testimony of the witness Jimmie Goff, the record reveals that prior to his conviction in this case, he had been sentenced and served a term in the State Penitentiary for burglary. He had been released only six months prior to the time he killed the three parties at the picnic on June 19, 1937, for which he is now serving a life term in the State Penitentiary for the murder of one of them, having two other murder cases now pending against him and undisposed of in Okmulgee county.

At the time of his trial he took the witness stand and testified that he did not do any shooting on that night, but that the defendant Olin Anderson had the gun and did the shooting. At the present trial he took the witness stand and admitted that he had the gun and did the shooting, and that the defendant Olin Anderson did not fire a shot. He admitted that he had committed deliberate perjury at the time of his trial. In addition to this, his testimony with reference to the defendant loading and handing him the gun is contradicted not only by the testimony of the defendant, but by the two state witnesses, Louise Smith and May Ethel Ragsdale, both of whom testified that they were with the defendant or near him at all times prior to the killing, and they at no time saw the defendant with the gun, or saw him hand it to the witness. These witnesses were used by the state, and therefore vouched for by the state. In passing, we will say that an examination of their evidence convinces one that they told the truth, and there was no attempt on their part to shield any one, or to testify falsely with reference to any facts connected with this case. Both of these witnesses, and the witness James Cravatte testified that Jimmie Goff had the gun from the time they

left Okmulgee to go to the dance. None of these witnesses ever saw the defendant in possession of the gun prior to the killing. This evidence is also corroborated by the witness Katie Fork, who saw him get the gun before they left Okmulgee.

With the witness Jimmie Goff admitting that he committed perjury at the former trial; the witnesses for the state contradicting his testimony given at this trial; his previous convictions; and having served two terms in the State Penitentiary, this court is confronted with a serious question as to what action it should take with reference to the verdict rendered.

We wish to say that the record reveals that no promise of any kind was made to this witness by the officers with reference to any favor that might be granted him in the two murder charges now pending against him in Okmulgee county, or with reference to his securing a pardon or parole; yet by the questions asked him and the answers made, it can readily be observed that it is his intention to apply for clemency, and that he has expectancy or hope of receiving aid, as he says, "from the citizens of Okmulgee county." We again reiterate that nothing in this record reveals that the officers of Okmulgee county have promised or intimated any help or assistance would be given him in this effort.

After fully reviewing this evidence, and again reading this record, we have come to the deliberate conclusion that the liberty of this defendant should not be restrained for a period of 15 years upon the evidence of Jimmie Goff.

We recognize the often repeated doctrines of this court, as heretofore stated, but we also recognize the fact that justice should be rendered one who is being deprived

of his life or his liberty, and with this thought in mind, we have come to the conclusion that the judgment and sentence rendered in this case should be modified to a term of four years in the State Penitentiary. This is the minimum punishment provided for one found guilty of manslaughter in the first degree. This defendant has now served in the State Penitentiary from the 21st day of July, 1941, to the present time. By being given credit for the time which he has served, his release may be had within a very short time.

The facts in the case of State v. Seymour, 7 Idaho, 548, 63 P. 1036, are very similar to the facts in the instant case. The majority opinion gives the argument on one side, and the dissenting opinion on the other side. Both sides have their merits. See, also, United States v. Murphy, D. C., 253 F. 404.

For the reasons above stated, we are of the opinion that the judgment and sentence of the district court of Okmulgee county should be modified from a sentence of 15 years in the penitentiary, to a period of four years in the State Penitentiary, and that defendant should be given credit for the time he has heretofore served, in compliance with the rules and regulations of the warden of the State Penitentiary.

As so modified, the judgment and sentence of the district court of Okmulgee county is affirmed.

JONES, P. J., and DOYLE, J., concur.