## DELLA HUBBARD v. STATE.

No. A-9722. April 2, 1941.

(112 P. 2d 174.)

374

See, also, 64 Okla. Cr. 18, 76 P. 2d 915.

A. C. Brewster, of Pryor, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Owen J. Watts, Asst. Atty. Gen., for the State.

BAREFOOT, P. J.   Defendant, Della Hubbard, was charged jointly with Roy Kinion with the murder of Ralph Hubbard, the deceased husband of defendant, in Mayes county, Okla., on the 4th day of December, 1937; was tried, convicted, and sentenced to serve a term of life imprisonment in the penitentiary, and has appealed.

Numerous errors are assigned by defendant.   Careful reading of the record reveals the necessity for consideration of but one of the errors assigned.   In defendant's brief two questions are asked: (1) Was there a crime committed? and (2) did Della Hubbard commit it?

If these questions are properly answered, it then becomes unnecessary to refer to other alleged errors.   This requires a reference to the facts as revealed by the record. The defendant, Della Hubbard, was jointly charged with Roy Kinion by information by the county attorney of Mayes county with having on the 4th day of December,

1937, murdered Ralph Hubbard, her husband. A severance was granted, and the defendant, Della Hubbard, was tried, convicted, and sentenced to serve a life term of imprisonment in the penitentiary. The record reveals that thereafter her codefendant, Roy Kinion, was tried and a verdict of not guilty was returned by the jury.

The facts are that the deceased and defendant lived on a small farm in Mayes county. That Roy Kinion was a nearby neighbor. He was married and was living with his wife. Roy Kinion and the defendant began a series of secret meetings and the exchanging of burning love letters. It is useless to encumber this record with their contents. They were such as two ardent lovers in their most thoughtless moment would write. Most of these letters were written in the summer of 1937 and three were written in November and December, 1937, prior to the death of Ralph Hubbard in December, 1937. A secret place under a rock was where the letters were placed, and a nearby haystack was the meeting place of this couple. The record reveals that defendant admitted having had sexual intercourse with Roy Kinion. On Saturday, December 4, 1937, deceased and defendant returned to their home from the town of Strang in Mayes county at about 4 p. m. This was the last time deceased was seen alive by anyone other than his wife and codefendant, Roy Kinion. On Monday morning, December 6, 1937, at some time between 10 and 11 o'clock a. m., his body was found in a small stream of water about 200 yards from his home. He was found in this small creek lying face down with his head turned slightly to the right. He was lying on his face and on his stomach with his hands and arms outstretched. The ice was frozen around his body. There were several abrasions on his body and also bruises. There was also a discoloration on his left eye and back of his ear, and an abrasion on his chin

and a scratch or two on his face. His face was partly buried in the water of the creek and the evidence of the doctors was that he had in their opinion died from drowning after being struck with some instrument and rendered unconscious. There was also mud on the back of his jumper and a number of witnesses testified that it was a handprint in this mud, but nothing to indicate by whom it was made or to indicate it was the hand of a female person that made it. Cockleburs were found upon the clothing worn by deceased and in his hair, and tracks were seen upon the bank near where the body was found. There was no evidence that these tracks were that of a female person. The shoes of the deceased were clean.

The evidence further reveals that about 50 steps from where the body was found, the cockleburs were broken down and that a path which led to where the body was found indicated that it had been dragged from this spot to where it was found in the small creek. His cap was also found. Up to this point, the only evidence connecting the defendant with this matter was that, when the body of deceased was taken from the creek, a blue button fell to the ground either from the pocket of deceased or from his clothing. This button was identified as coming from the coat of the defendant, and she admitted that it had, but her explanation of this circumstance will be hereafter referred to.

A coroner's inquest was held on the creek bank where the body was found and many persons were present to view the body. Much of the testimony in the record is from these witnesses and it is not material to the issue here involved. There is nothing in any of this testimony that either directly or indirectly connects this defendant with the murder other than has been heretofore stated.

The defendant made three different statements. These statements are here copied. They were somewhat conflicting, but give the facts. The first was made at the office of the county attorney on Wednesday, December 8, 1937. The second was made at the Green Funeral Home in Pryor on December 9, 1937, when defendant was shown the body of her deceased husband, and the third was made at her home on December 11, 1937.

The first statement was as follows:

"Statement taken from Della Hubbard this 8th day of December, 1937. By H. A. Kehn, County Attorney.

"Q. Your name is Della Hubbard? A. Yes, sir. Q. Have you consulted a lawyer since this trouble came up? A. No, sir, I just talked with the sheriff. Q. Now, Della, I want to ask you some questions, but it is my duty to tell you that any answers you might make may be used against you if this case ever comes to trial. And now, with that in view, I want to ask you some questions. A. All right,— Q. How long have you and Mr. Hubbard been married? A. Ten years. Q. Do you have any children? A. No, sir. Q. When did you last see Mr. Hubbard alive? A. Sunday morning at 11 o'clock. Q. Where was he then? A. Cutting wood. Q. How far is that from the house? A. Right close to the kitchen. Q. Did he cut any wood? A. He cut four sticks and came in and built up my fire so that I could get my mince meat finished. Q. You say that was on Sunday morning? A. Yes, sir. Q. When did you first become uneasy about him. A. Between 2 and 3 o'clock. Q. That same day? A. Yes, sir. Q. You had been having domestic troubles, hadn't you? A. No, sir. Q. Was he not jealous of some one? A. No, sir. Q. Didn't he accuse you of being intimate with some one? A. No, sir. Q. He never did accuse you of that? A. No, sir. Q. From where the body was found, how far was it to the house? A. I don't know how far it was. Q. About how far from the hat was the body? A. I didn't see the body only at a distance, and I never seen the hat at all. They showed me the things they took from his pockets. Q. Della, I am going to tell you

what we know about this case. That man was not at home Sunday morning; he was not there Saturday night. It was cold Sunday, wasn't it? A. Yes, sir. Q. The ground was frozen, wasn't it? A. Yes, sir. Q. Then, did you notice those tracks around there? A. No, sir. Q. Why is it that you became uneasy so soon after you missed him? A. I noticed that he had quit chopping wood, and I thought he had gone up to the corner to get the paper. I gave him plenty of time to get back and when he didn't come back, I went up to Ed Kinion's and asked if he had been there. Q. Do you know Roy Kinion? A. Yes, sir. Q. Have you ever received any letters from him? A. Yes, sir. Q. Have you got those letters or notes? (Question to Walter Panter). (Sheriff hands letter and notes to county attorney, H. A. Kehn.) Q. I will hand you this letter or note marked State's Exhibit 'A', and ask you if you ever saw that before? A. Yes, sir. Q. Do you know who wrote that? A. Yes, sir. Q. Who wrote that? A. Roy Kinion. Q. When did you get that? A. I don't remember just what night. One night last week. I believe it was on Friday night of last week. Q. How did you get this letter through the mail? A. I got it from under a rock by a post. Q. Did you answer that letter? A. Yes, sir. Q. I will hand you State's Exhibit 'B', and ask you if you ever saw that before? A. Yes, sir. Q. Who wrote that? A. Roy Kinion. Q. When did you get that letter? A. I don't know, but sometime last summer. Q. You got it before this other letter? A. Yes, sir. Q. Is that in the same condition that it was when you got it? A. Yes, sir. Q. Was this mark on there when you got it? A. Yes, sir. Q. What does that mark mean, do you know? A. No, sir. Q. I will hand you State's Exhibit marked 'C' and ask you if you ever saw that before? A. Yes, sir. Q. Who wrote that? A. Roy Kinion. Q. Do you know when you got that—did you get it recently? A. No, sir, I have only got three recently. Q. How did you get that one? A. Just like I got the others. Q. I will hand you Exhibit 'C' and ask you if you ever saw that before? A. Yes, sir. Q. Who wrote that? A. Roy Kinion. Q. Did you get that the same way? A. Yes, sir. Q. I will hand you State's Exhibit 'D' and ask

you if you ever saw that before? A. Yes, sir. Q. Who wrote that letter? A. Roy Kinion. Q. Did you get that in the same way? A. Yes, sir. Q. I will hand you this exhibit marked 'E', and ask you if you ever saw that before? A. Yes, sir. Q. Did you get this in the same way? A. Yes, sir. Q. Do you know anything about the time you got this? A. No, sir, I haven't got but three that was wrote lately. Most of them was wrote last summer. Q. I will hand you State's Exhibit 'F' and ask you if you ever saw that before. A. Yes, sir. Q. Who wrote that? A. Roy Kinion. Q. Did you answer all of these notes? A. Yes, sir. Q. I will hand you State's Exhibit 'G' and ask you if you ever saw that before? A. Yes, sir. Q. Who wrote that? A. Roy Kinion. Q. Do you remember when you got that letter? A. No, sir. Q. Was it recently or sometime ago? A. No, I haven't got but three recently. Q. The first one I handed you is one of them? A. Yes, sir. Q. I will hand you State's Exhibit 'H', and ask you to look at it and tell me if you ever saw that before? A. Yes, sir. Q. Who wrote that? A. Roy Kinion. Q. Did you answer that? A. Yes, sir. Q. When did you receive that? A. Last summer. Q. I will hand you State's Exhibit 'I', and ask you if you ever saw that before? A. Yes, sir. Q. Who wrote that? A. Roy Kinion. Q. Do you know when you got that, was it recently? A. Yes, sir. Q. When did you get that? A. I think I got it Friday night. Q. Of last week? A. Week before last. Q. That would have been on the 3rd? A. Yes, sir. Q. That is Friday before he disappeared on Sunday? A. Yes, sir. Q. I will hand you State's Exhibit 'K', and ask you if you ever saw that before. A. Yes, sir. Q. Who wrote that? A. Roy Kinion. Q. When did you get that? A. Last summer. Q. Did you answer that? A. I answered most of them, but not all of them and I don't remember if I answered that one or not. Q. Did you meet him occasionally? A. He came down there a few times. Q. Where did you meet him? A. He came to the house. Q. Was Mr. Hubbard there? A. Sometimes he was and sometimes he came when he wasn't there. Q. I will hand you State's Exhibit 'L', and ask you if you ever saw that before? A. Yes, sir. Q. Who is that? A. Roy Kinion. Q. I will hand

you State's Exhibit 'M', and ask you what that is. A. It is a picture of Roy Kinion. Q. What place is that? A. Somewhere in Colorado. Q. Was he there? A. Yes, sir. Q. When was he there? A. When that was made, I don't know when. Q. I will hand you State's Exhibit 'N', and ask you if you ever saw that before? A. Yes, sir. Q. Who wrote that? A. Roy Kinion. Q. This says Thursday night —when was that, last Thursday? A. Yes, sir. Q. Where did you find this? A. Under a rock by a post. Q. Did you notice there is a bottle there in that last room of your house with some kind of liquid in it? A. My husband had some gin that his brother brought him from California. Q. Did you have that bottle? A. No, sir. Q. Did you ever drink any of it? A. I tasted of it when my brother-in-law brought it. Q. What is his name? A. Milford Stanford. Q. What was your maiden name? A. Bradley. Q. Where did you live before coming to Strang? A. In Missouri. Q. Have you been married before? A. No, sir. Q. Where did you first meet Mr. Hubbard? A. In Strang. Q. How did you happen to be there? A. We moved there from Missouri. Q. When did you move there? A. In 1914, I think it was. Q. Did your father run a livery stable there? A. My grandfather did, not my father. Q. Your husband knew about this feeling between you and Roy Kinion, didn't he? A. If he did he never mentioned it to me. Q. Where were you on Friday night? A. At home. Q. Where were you on Saturday night? A. At home. Q. Didn't you talk to somebody about going to a dance? A. My husband was teasing Clint Watkins, but we didn't go. Q. Were you in Strang Saturday? A. Yes, sir. Q. What time did you go there? A. Between 1 and 2. There is a drawing there on Saturday at 1:30, and we got there for the drawing. Q. What time did you leave town? A. Between 4 and 5. Q. I wish you would tell me the truth about this. There is some of these things that just couldn't be true. A. Well, I told this man that investigated it the truth, and I will tell the truth now if they hang me. Q. All right, just go ahead and tell me all about it. A. Well, that fellow came down to my house about two years ago— Q. Do you mean Roy Kinion? A. Yes. He brought a

bottle of homebrew and he set it on the table. I was in the bedroom sewing and he came in and set down on the bed and reached his arm around like he was going to put it around me— Q. Where was your husband? A. In the field. Q. What time was that? A. At about four o'clock. There was a stick of wood lying there that I kept the window up with, and I picked it up and told him, told him if he didn't act right I would knock him in the head with it. He began to tell me how much he loved me and how long he had loved me, and things just lead on and just went from that on. Q. How long had you known him? A. Ever since I was small. I had known him ever since I had been married. Q. And still after that you answered his letters and everything after you had run him off with a piece of stove wood, and you have met him at night, haven't you? A. He had not been writing letters then. When he would come, he would always come in the daytime except one time last August he came at night when my husband was away. Q. He came at night then? A. Yes, sir. Q. Did he come to your house? A. Once he did. Q. But you met him outside your home several times? A. I met him two times. Q. Did you ever have intercourse with him? A. Yes, sir. Q. You know where his cap was found? A. No, sir. Q. Didn't Jess McCreary show you where his cap was found the other day when we were there? * * * Q. But when he left, you didn't hear any commotion. A. No, sir. Q. You didn't see anybody? A. No, sir, I was busy with my mince meat because we were getting ready to move. I didn't finish about those notes. Q. What further do you want to say about them? A. Well, his wife got on to us writing and she came down there and got on me, and then he came down and asked me what we were going to do about it. He came down that night. Q. I will hand you State's Exhibits 'A', 'J' and 'N', and ask you if those are the ones you received recently? A. Yes, sir. Q. State's Exhibit 'N' is the one you got on Thursday? A. Yes, sir, it was put there Thursday. Q. And you got it Friday? A. Yes, sir. Q. When did you go out and look for these notes? A. When I was going to the mail box, but he changed places after his wife caught up with us and started putting them

over in our place. Q. How do you know that he changed places? A. He told me. Q. Then you have seen him personally recently? A. Not since the first week in August, only just to speak. Q. Then Roy Kinion is a married man? A. Yes, sir. I didn't want to start that up again because I knew that it would just cause trouble. Q. When was it his wife got on you? A. Last summer, in August sometime. Q. Didn't you and your husband have several arguments and discussions about your being intimate with this man? A. No, sir; if he even knew, he never mentioned it to me. Q. Just what is your theory about this? How do you think he came by his death. A. I believe he lost his mind or that aspirin he took made him crazy. Q. How do you account for those bruises on his head and face? A. I didn't see them. Q. He was bruised? A. Well, he was hit then, unless he made them when he fell. Q. Sheriff, do you know of anything else? By Mr. Panter, Sheriff: Q. When did you get this note that is marked State's Exhibit 'F'? A. Last August. By H. A. Kehn, County Attorney: Q. You say now that all these except these three were received in August? A. Not all in August, but during the summer. Q. Do you know about how long it was during the time that he didn't write any notes? A. From August to the first of December. Q. These notes that you have identified were all written in December? A. I got one of them in November and the other two in December. Q. Who thrashed your grain? A. Raymond Templeton. Q. What day and month was that? A. It was along toward the last of July. I don't know the exact day. Q. And you and Roy had ceased being friendly then? A. Yes, sir, that was when we quit. Q. Was that before you thrashed? A. After. Q. Didn't Roy and your husband have trouble while thrashing? A. No, it was after. Q. What did they have trouble about? A. Roy came down there drunk and jumped on Ed and my husband. Q. What did he jump on them for? A. It was about some tale that Ed told. He came over from the river, his wife said, and he jumped over the fence and called them both a son-of-a-bitch. Q. That was Roy? A. Yes. Q. Were you mixed up in that? A. I didn't know what was told until afterwards. Q. Did you ever meet Roy over there

by the straw stack? A. Yes, sir, twice. Q. When was that? A. In August. Q. Was it daytime or nighttime? A. Nighttime. Q. Where was your husband at these times? A. He was gone to hunt a place for us to move. Q. Did you write these notes between times? A. Yes, sir. Q. How did Roy know your husband was gone? A. My husband come to Pryor with him. Q. He came to town with Roy? A. Yes, sir. Q. Where was he going? A. To Collinsville, Okla. Q. Did he stay all night? A. He stayed a week and during that week Roy met me frequently and when he came back Roy asked me what we were going to do. Q. Was that at night too? A. Yes, sir. Q. What was the idea of meeting at the straw stack? A. That was where he wanted to meet me. He was afraid some one would see us. Q. Had he been coming to your house? A. He had been there twice. Q. Did Roy ever buy you a pair of slippers and put them in your egg basket? A. Yes, sir. Q. Did he ever give you any money? A. No, sir. Q. He was kinda crazy about you, wasn't he? A. He said he was. Q. And he took desperate chances to see you, didn't he? A. Yes, sir. Q. What do you think of Roy? A. I don't think anything of him. I just thought that I did, but I know now that I didn't. Q. Do you tell us now that you and your husband were getting along and not having any quarrels? A. I guess we had spats, but they were over in 30 minutes. I had a spell of sickness and everybody said we were separated, but my husband and brother came after me the next Sunday. Q. On the day before you say he was killed, who rode to town with you? A. No one. Q. Who rode home with you? A. No one. Q. You and him were all by yourselves? A. Yes, sir. Q. What time did you go to bed? A. About 8 o'clock. Q. Did you leave the light burning? A. No, we blowed it out. Q. And there was no light in your house from the time that you went to bed until you got up the next morning? A. No, sir. Q. Were you present when he talked to some one about going to a dance? A. Yes, sir. Q. Who was he talking to? A. Clint Watkins. Q. Now, will you tell us just what was said? A. Clint asked if we were going to Strang to the dance, and my husband and I told him and his wife that we were going to

Salina, but we stayed at home all evening. Q. Did you ever go to any dances over at Salina? A. We went to two over there. Q. Did your husband dance? A. Once. Q. Now, on Sunday it was cold, wasn't it? A. Yes, sir. Q. It didn't thaw any, did it? A. Not much. Q. The sun was not shining, was it? A. No, sir. Q. So if there were any tracks there toward the creek they were made before Sunday? A. He was home until 11 o'clock. Q. Who did you first see about your husband being absent? A. I went to the paper box first and then to Roy Kinion's, and asked if he was there. Q. Did you go in? A. No, I just honked the horn and he stuck his head out the door and I hollered and asked him if Mr. Hubbard was there, and he said no. Q. What time was that? A. It was between 2 and 3. Q. Was that on Sunday afternoon? A. Yes, sir. Q. And he was going to cut wood there in the yard? A. Yes, sir. Q. He was not going out in the field? A. If he was going off the place, he didn't say anything about it. Q. Did you have a car? A. Yes, sir. Q. What has become of the car? A. It is there at home. They used it when they searched for him on Sunday night. Q. What kind of a car is it? A. It is a Chevrolet. Q. It is a touring? A. No, it is a coupe. Q. Do you drive a car? A. Yes, sir, my husband couldn't drive. Q. Did you ever drive in this car with Roy Kinion? A. No, sir. Q. Did you ever say anything to Mr. Hubbard about getting a divorce? A. No, sir. Q. Did he ever threaten you with a divorce? A. No, sir. Q. When before Sunday were you ever down there in that field? A. On Tuesday when they were loading the cattle. Q. Did you help load them? A. No, sir. Q. What kind of shoes did you wear down there? A. Oxfords."

Questions by H. A. Kehn, County Attorney:

"Q. What day was that? A. On Tuesday before he was killed. Q. How many cattle did he load? A. One cow and two heifers. Q. How much did he get for them? A. $112. Q. What did he do with that money? A. He paid part of it on debts. Q. Who did he pay the debts to? A. First National Bank, and he owed $15 to Mr. Watkins, and he sent to Southwest City for some flour and dry goods

and deposited some in the bank. He paid some on the car and he had to pay for some work done on the car. Q. When was that? A. I believe it was on Wednesday before we butchered. Q. Was that last week? A. Yes, sir. We butchered on Thursday. Q. Well, how many hogs did you butcher? A. Two. Q. Where is that meat now? A. In a box in the smokehouse at home. Q. Who is taking care of the stuff out there? A. Ed Kinion was. Q. Did he have any other money from any other source at the time he was killed? A. Not that I know of. We didn't have any income at all except from the cream, and that wasn't very much. Q. When you went down there where they were loading the cattle, did you wear boots and overalls? A. I had on overalls, but I had on my oxfords and overshoes. Q. Where did you keep these notes? A. In the bedroom up over the door. Q. Did you keep them in this box? A. Yes, sir. Q. Did he ever ask you what was in that box? A. I don't know that he ever seen it. Q. Was it hidden? A. Yes, sir, Q. Where was it hidden? A. Down behind the door facing. Q. Your given name is Della? A. Yes."

"I, Della Hubbard, having had the above questions asked me and having voluntarily answered them, and without promise of reward or leniency of any kind and I have made this record in the presence of H. A. Kehn, county attorney, Walter Panter, sheriff, and Lillie Shearer, stenographer."

The second statement, December 9, 1937, was as follows:

"At Green's Funeral Home.

"Those present: H. A. Kehn, county attorney, B. F. Wilson, deputy sheriff, Walter Panter, sheriff, C. S. Brantley, Mr. and Mrs. Green and Lillie Shearer, stenographer.

"Confession

"I, Della Hubbard, wife of Ralph Hubbard without promise of reward, without any promises having been made to me, but that the truth may be known and justice done I hereby in the presence of the said parties make the following voluntary statement:

"Q. When did Mr. Hubbard meet his death? A. Saturday night. Q. About what time? A. After 10. I don't say just what time. Q. Who was over there? A. Roy Kinion. He just came over there and called my husband out. I just supposed they were out there talking. I didn't go out. I heard them then, sounded like they were fighting. I heard him groaning and I ran out by the barn. He had killed him. I guess he used a post. It was about 500 yds. from the house. I never went near the body after he was killed. I went back to the house. I stayed there all night by myself. He came back and told, said he had killed him and told me not to chirp it. He never came in house. He said he throwed him in the branch. I never told until the next day. I haven't seen him since.

"Dated this 9th day of December, 1937.

"Mrs. R. W. Hubbard."

The third statement was as follows:

"At the Hubbard home, dated this 11th day of December, 1937. Those present: H. A. Kehn, county attorney, Walter Panter, sheriff, B. F. Wilson, deputy sheriff and Lillie Shearer, Steno.

"We got home from town Sat. evening about 4 o'clock. He went and got the cows as soon as we got home, then we milked, then ate supper about 6:30 o'clock. We went in the front room and sat down to read the newspapers. We read until about 8 o'clock, then we went to bed. Someone come up about 11:30. I didn't see the person but I heard the voice—called 'Hub'—came up to the porch and told him to come out. He got up and dressed and put his coat and wraps and went around the southeast corner of the house and after they was gone awhile I heard a noise, hollered, and I jumped. I ran to kitchen door, they sounded like they was south of the house. I jumped in my clothes and ran to the corner of the barn. I seen the bulk of somebody and I seen who it was. It was Roy Kinion. I asked him what was the matter and he said, 'By God! I killed Hub and you better not chirp it.' It was about 15 minutes after they left before I heard him holler. He, Roy, went on away and I thought he was mad at me too. I never

went down there just then, but after he left I went down there and looked at the body of my husband but I was afraid to do anything. He was here about 45 minutes. The lights were not on when he came, but I lit the lamp and left the light burning about two hours. He had told me before that 'by God' he wouldn't live always without me. That was in July about thrashing time. On the next day between two and three o'clock I went up to the corner and asked Roy Kinion if he was there. Roy came to the door and said he was not there, then I went to Ed K. and he went with me to Kaylor's, and Roy came back from the corner in the car. We drove the car there where the wagon is and stopped. He made the first round west of the straw stack across the branch and come back to the fence right close and come on toward the house. He crossed south and west 30 yards from the body. Ed Kinion went down the branch and climbed over the fence about 15 steps from the body. He was going down the branch. I was standing by the straw stack. They didn't find him, so come back to the car, so they decided to go west and stayed awhile, then they came back. When they got back John Kinion was here. Then they went to Nelson's to see if he had been there. When they all come back it was dark and we went to town to call the C. C. C. boys. When I first went over there to Roy K. he just stuck his head out and said no. We went on up to Kaylor's. Roy was standing down at the corner and he got in the car and we all came back down here to the house.

"I have on this the 11th day of December, 1937, made the above statements in the presence of Walter Panter, sheriff, B. F. Wilson, deputy sheriff, H. A. Kehn, county attorney and Lillie Shearer without any promise of reward and without any threats or compulsion on the part of anybody but only that the truth may be known and that the guilty party may be punished.

"Della Hubbard."

With the review of the evidence and the statements of the defendant as heretofore given, the answer to the first question is that there cannot be much of a doubt that the

deceased Ralph Hubbard was murdered and that his body was placed in the creek and his death caused by drowning. We shall now analyze the evidence as shown by the record before attempting to answer the second question. In this connection we shall keep in mind several well established rules of law.

First, the fact that defendant was convicted and that her codefendant, Roy Kinion, was afterwards acquitted is no justification under the law for the reversal of the case of defendant, provided the evidence justified her conviction. Woody v. State, 10 Okla. Cr. 322, 136 P. 430, 49 L. R. A., N. S., 479; Dunn v. United States, 284 U. S. 390, 52 S. Ct. 189, 76 L. Ed. 356, 80 A. L. R. 161; Chiaravalloti v. United States, 7 Cir., 60 F. 2d 192; 22 Corpus Juris Secundum, Criminal Law, page 376, § 242.

Second, the rule that has been so often announced by this court that a case will not be reversed where there is a conflict in the evidence and the jury has passed upon the same, and that where there is any evidence to support the judgment and sentence, the same will not be set aside. Williams v. State, 63 Okla. Cr. 234, 74 P. 2d 632; Saferite v. State, 67 Okla. Cr. 229, 93 P. 2d 762; White v. State, 13 Okla. Cr. 76, 162 P. 232; Morris v. State, 67 Okla. Cr. 404, 94 P. 2d 842; Gray v. State, 66 Okla. Cr. 211, 90 P. 2d 686.

Third, the rule that where the evidence is wholly insufficient to support the judgment and sentence, this court will not hesitate to do its duty and set the same aside. Phillips v. State, 64 Okla. Cr. 454, 82 P. 2d 246; Clardy v. State, 64 Okla. Cr. 463, 82 P. 2d 239.

With these well recognized rules of law in mind, we shall proceed to examine the evidence in this case. We shall first consider the evidence independent of statements of defendant heretofore quoted, the letters written and her statements made to officers before and after she was

placed in jail. This evidence, which covers many pages of the record, concerns the life of deceased prior to the murder charges, and the letters that were written between defendant and her codefendant, Roy Kinion. It may be noted that in these love-laden letters there is never at any time any threat of any kind by either of the parties against the deceased. There are only explanations of a longing desire that they may not always be separated.

The other evidence concerns the search for the body of deceased, the finding of the body, the coroner's inquest, and the evidence as heretofore related. In this evidence there is only one circumstance that tends to connect the defendant with the homicide, and that is the finding of the button from her coat that fell from the body of deceased at the time it was taken from the creek. Her explanation of this is the evidence of Mr. C. H. Hopper, a neighbor, who testified as follows:

"Q. I will ask you if Mr. and Mrs. Hubbard were at your home a short time before his death? A. Yes, sir. Q. About how long? A. Before his death? Q. Yes, sir. A. About two weeks. Q. What was the occasion of their being at your home? A. Well, they come over there and played pitch awhile. Q. At your home? A. Yes, sir. Q. What time did they leave your home that evening? A. Well, about 10 o'clock; somewheres around about that time. Q. At that time—at the time they were getting ready to leave, what happened, if anything, to a button on Mrs. Hubbard's coat? Mr. Watts: Object to that, your Honor, as suggestive and leading. The Court: Well, it is in a way. Overruled. Don't lead the witness. Mr. Brewster: Just give him the subject matter. Q. Did you see anything occur there, or know of anything that occurred in your presence about a button on a coat; if so, state what it was. A. Well, when they was getting ready to go home, why she was putting on her coat, and I heard something hit the floor and I said, 'You dropped something there', and she said, 'Yes, it is a button off my coat.' Q. What became of it, if you know?

A. Well, she went ahead and put on her coat, and picked it up and handed it to Ralph, and he went through the motion of putting it in his pocket. Q. Who was Ralph? A. Hubbard. Q. What pocket did he begin to put it in— in what garment did he put it in? A. Why, he put it— he had on two jackets. Q. All right. Which one was on the outside? A. He put on a blue jumper over his jacket when he started home, and he went through the motions of putting it in his under jacket. Q. That is, what you call the bib overalls? Mr. Watts: We object to that, your Honor, leading and suggestive. The Court: Sustained. By Mr. Brewster: Q. What kind of a garment was this, you know? A. Just a jacket. Q. What side did he put it in? You motion with your hand which side—which side did you mean? A. Well, right—this side (indicating). Q. The right side? A. The right side. Q. Did you see Mr. and Mrs. Hubbard any more after that occasion when this button occurred? A. Yes, we stayed all night there the next Saturday night. Q. I mean, did you see him any more alive? A. No, sir. Q. You are not any kin to them? A. No. Q. Just friends? A. Yes, sir. Mr. Brewster: That's all."

In our view of this evidence and of the surrounding facts, it cannot be said that it is sufficient to justify the jury in returning a verdict of guilty against the defendant. This one slight circumstance, in the light of the above explanation, would not be sufficient to justify a conviction of the defendant for the murder of the deceased. The evidence, to be sufficient, must come from other parts of the record to which we shall refer.

The next evidence to be considered are the letters that passed between the defendant and her codefendant Roy Kinion. There were introduced in evidence 15 letters, three written by defendant and 12 by Roy Kinion. As above stated it is unnecessary to encumber this record and lengthen this opinion by quoting them. They reveal the deepseated love between these parties, and coupled with the evidence afterwards revealed an illicit relation between

them. This evidence was admissible for the purpose of showing the motive for the taking of the life of the deceased, Ralph Hubbard, but when one is charged with the crime of murder it is necessary to prove a conspiracy or an actual participation in the murder by the doing of some overt act by the one charged. The fact of the relationship between the defendants is not alone sufficient to convict this defendant of murder.

This court in a very early decision by Judge Richardson in the case of Moore et al. v. State, 4 Okla. Cr. 212, 111 P. 822, 824, said:

"To constitute one a party to a crime under this statute, it is necessary that such person be concerned in the commission of the offense—that is, that he either commit it or aid or abet its commission—and it is not sufficient that he merely acquiesce therein. Consenting and acquiescing are mere mental acts, which, unless communicated to the perpetrator of the offense, in no manner aid or abet him in its perpetration. To be concerned in the commission of crime, one must either commit the crime himself, or procure it to be done, or aid or assist, abet, advise, or encourage its commission. But a mere mental assent to or acquiescence in the commission of a crime by one who did not procure or advise its perpetration, who takes no part therein, gives no counsel and utters no word of encouragement to the perpetrator, however wrong morally, does not in law constitute such person a participant in the crime. Drury v. Ter., 9 Okla. 398, 60 P. 101; Pearce v. Ter., 11 Okla. 438, 68 P. 504; White v. People, 81 Ill. 333; Jones v. People, 166 Ill. 264, 46 N. E. 723; Clem v. State, 33 Ind. 418; State v. Orrick, 106 Mo. 111, 17 S. W. 176, 329; Burrell v. State, 18 Tex. 713; People v. Ah Ping, 27 Cal. [489] 490; People v. Woodward, 45 Cal. 293, 13 Am. Rep. 176; Walrath v. State, 8 Neb. 80; Kemp v. Com., 80 Va. 443; Butler v. Com., 63 Ky. 435 [2 Duv. 435]; State v. Hildreth, 31 N. C. 440 [9 Ired. 440], 51 Am. Dec. 369; Connaughty v. State, 1 Wis. 159, 60 Am. Dec. 370."

In the case of Drury v. Territory, 9 Okla. 398, 60 P. 101, 107, Chief Justice Burford in an elaborate opinion said:

"In order to convict the defendant of the crime charged, it was not sufficient to prove that he was present at the commission of the crime, but, in the language of our statute, he must 'aid and abet in its commission.'"

And in quoting from the case of Clem v. State, 33 Ind. 418, it was stated:

"'It is plainly not the law that one can be guilty of murder, without overt act, who by neither word nor gesture has done anything to contribute to the commission of the homicide, or to assist, encourage, or evince approval of it at or before the fact, and of whom it only appears that he was present, and knew of the crime, and mentally approved it. The silent thought, however wicked in view of the Searcher of Hearts, is not a crime against our laws, but is left by them to another than a human tribunal.'"

In Drury v. Territory, supra, it is further said:

"It is not sufficient to show that the defendant was present, and knew the offense was being committed. The proof must go further, and show, beyond a reasonable doubt, that he was participating in the homicide before or at the time of its commission. Wade v. State, 71 Ind. 535. 'There is a plain distinction between consenting to a crime and aiding and abetting in its perpetration. Aiding and abetting are affirmative in their character; consenting may be a mere negative acquiescence, not in any way made known to the principal malefactor. Such consenting, though involving moral turpitude, does not come up to the meaning of the words of the statute.' White v. People, 81 Ill. 333."

In a late opinion by Judge Doyle, in the case of Smith et al. v. State, 66 Okla. Cr. 408, 92 P. 2d 582, it is said in the third syllabus:

"To constitute one a party to a crime, it is necessary that such person be concerned in its commission, and it is not sufficient that he merely acquiesces therein with knowledge that another is committing the offense."

In this case the case of Moore et al. v. State, supra, is quoted and again approved, and the court further says:

"The last expression of this court is found in the case of Olin Anderson v. State [66 Okla. Cr. 291], 91 P. 2d 794, wherein this court held under our Code of Criminal Procedure, sec. 1808, Oklahoma Statutes Annotated, title 21, section 172, that under this section, 'to be concerned in the commission of crime as a principal, one must either commit the crime himself, or procure it to be done, or aid or assist, abet, advise, or encourage its commission. A mere mental assent to or acquiescence in the commission of a crime by one who did not procure or advise its perpetration, who takes no part therein, gives no counsel and utters no word of encouragement to the perpetrator, however wrong morally, does not in law constitute such person a participant in the crime.' Citing the previous cases herein and also many authorities from other jurisdictions to a like effect."

See, also, Evinger v. State, 57 Okla. Cr. 63, 45 P. 2d 552.

There is not a line of evidence in the record to show a conspiracy between the defendant and her codefendant, Roy Kinion, to take the life of the deceased.

We next come to the consideration of the three statements made by defendant and which have heretofore been quoted. Prior to the taking of these statements the defendant had been taken to within 15 or 20 feet of the body of her deceased husband soon after it was found and while lying on the bank. Her only comment at that time was with reference to the search that had been made for the body by Roy Kinion and Ed Kinion, his brother, and herself. There was no admission on her part as to who had

committed the murder. On the 8th day of December, which would be the Wednesday following his death on Saturday night, the 4th of December, she was taken to the office of the county attorney of Mayes county. She had no attorney at that time, but was warned by the county attorney that any statement which she made could be used against her if the case ever came to trial. In this statement the defendant denied any knowledge of the murder of her husband, which in view of the statements later made and the evidence produced, was undeniably false. The statement that her husband had left the home for the purpose of chopping wood prior to 11 o'clock Sunday morning and that she had not seen him since that time was a false statement. The evidence is conclusive that the deceased was killed on Saturday night, December 4th, and was not alive on Sunday morning. But it should be borne in mind that while this is a circumstance to be taken into consideration, it should also be understood that this defendant is charged with murder and not with the making of false statements or the concealing of a crime. This record reveals a relationship between the defendant and her co-defendant, Roy Kinion, that would in all probability cause her to make false statements to protect him the same as to protect herself. The statement deals with the letters heretofore mentioned and she identifies them as letters by Roy Kinion and admits that she wrote part of them.

The second statement, made on the 9th day of December, 1937 (Thursday), at Green's Funeral Home, was labeled "confession." A confession, under the law, is a voluntary statement made by a person charged with a crime or misdemeanor, communicated to another person, wherein he or she acknowledges themselves guilty of the offense charged, and discloses the circumstances of the act or the share and participation which he or she had in it.

Mays v. State, 19 Okla. Cr. 102, 197 P. 1064; Edwards v. State, 46 Okla. Cr. 77, 288 P. 359.

The statement made by the defendant in this instance does not come within this definition, for the reason that nowhere does she admit that she participated in or had anything to do with the commission of the offense. Her statement was strong evidence against her codefendant, Roy Kinion, and under this record, if he had been on trial and a conviction had been secured, his conviction would have been upheld by this court. But the mere fact that she had knowledge that a murder had been committed, and that she saw the body of deceased lying in the creek, is not sufficient to convict her of his murder. Anderson v. State, 66 Okla. Cr. 291, 91 P. 2d 794. It was outrageous to think that a wife should see her own husband murdered and not come to the rescue, and it is almost unbelievable.

There cannot be much doubt of her desire for his death under the circumstances in this case, but it can also be said there is no evidence in this record which reveals a conspiracy on her part to commit the murder or any overt act on her part to carry it into effect. Every word in the statements may be true, yet there is nothing therein that would cause this defendant to be guilty of murder under the law.

The third statement, made at the home of the defendant, and the evidence of the oral statements made to the officers at the time she was in jail and prior thereto, are practically the same as the second statement made by her. They are more elaborate, but in them she charges her codefendant with the commission of this crime, but nowhere admits that she participated therein.

The only part of the record to which we have not referred is that part which revealed that Roy Kinion and

deceased had a fight during the summer of 1937. This would in no way militate against the defendant. Also, that on Sunday she offered to pay a funeral policy of her deceased husband. This could very easily be true, her knowing of his death, even though she did not participate therein. We have vainly searched this record to find evidence to support the judgment and sentence against this defendant for the commission of the crime of murder, and aside from the one circumstance of the button which came from defendant's clothing, which is explained, and the relationship between her and her codefendant, Roy Kinion, that is all that can be found. Certainly these circumstances are insufficient to uphold this judgment and sentence of life imprisonment of this defendant. Certainly a murder has been committed, but this record does not justify this court in saying that this defendant, Della Hubbard, committed the murder or participated therein as required by the law to hold her responsible therefor, no matter how wrong her conduct.

For the reasons above stated, the judgment and sentence of the district court of Mayes county is reversed, and unless the county attorney is of the opinion he has evidence sufficient to convict defendant and to hold her for further trial, it is ordered by the court that she be discharged.

It is further ordered that the warden of the penitentiary deliver the defendant, Della Hubbard, to the sheriff of Mayes county to be held pending the further order of the district court of said county.

JONES and DOYLE, JJ., concur.