Sammy BAYLESS, Plaintiff in Error,

v.

STATE of Oklahoma, Defendant in Error.

No. A–12832.

Court of Criminal Appeals of Oklahoma.
March 16, 1960.

Carroll Samara, Herbert K. Hyde, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., John Whelan, Jr., County Atty. Canadian County, Ralph Myers, Jr., Asst. County Atty. Canadian County, El Reno, for defendant in error.

NIX, Judge.

Sammy Bayless, hereinafter referred to as the defendant, was charged by information with the crime of assault and battery with intent to kill. He was tried before a jury, was found guilty of the lessor offense of assault and battery with a dangerous weapon. His punishment as fixed by the jury was to serve five years in the state penitentiary.

The defendant being charged was the result of an altercation which took place in a Canadian County night club, known as Jeep O'Neal's. The prosecuting witness testified she went to the night club about 3:00 or 3:30 a. m. That she saw the defendant and codefendant, Monte Trussel, upon her

arrival. She had known the defendant for many years and had worked for him as a prostitute. He served in the capacity of a "pimp". That around 7:00 a. m. she became involved in a conversation with Monte, who wanted her to return to her occupation as a prostitute and go with him to Lawton. She refused to go. Defendant agreed with Monte that she should go and that Monte would make her a good pimp or "old man". Her refusal and Monte's insistence led to argument, then to a fight. A fight wherein defendant and Monte did all the fighting and the prosecuting witness did all the receiving. Her testimony in that regard is reflected by the following excerpts from the transcript:

"A. Well, it was Monte and I who got into it at first. We had words and he said that I should go to Lawton with him and I told him no I wasn't and Sammy didn't do no more than agree on that part. It was the fight because Sammy wasn't much in conversation until after we got to the fight, and then we were just screaming and cursing at each other then, he slapped me and oh, I was down and I was so frightened; well, I was so scared I just didn't know much of what was happening except it was running through my mind that I was going to be killed like the girl that was killed and buried before and that was all that could go through my mind. And I don't know, it's all so vague to me now because it's been in November. I can remember the incident and being hurt because I was the feminine gender on the part and naturally a man's going to be stronger and he did slap me and he had a board and as to whether or not he hit me with the board is beyond me because I know there was a blow struck then, but as to whether or not it was with a board I don't know, because I shut my eyes and just rolled over.

"Q. Now, where was this Becky, was this inside? A. This was in the back.

"Q. Was this inside the building part, or outside? A. No, this was in the back an, sir, they didn't drag me out to the back, Monte said he wanted to talk to me out at the back so I stepped out there and we had words out there and Sammy, I suppose, came out to see what it was all about, and then we had words and he slapped me and the next thing I knew, the law was called and the woman was screaming out the window.

"Q. Do you recall what the woman said Rebekah, that screamed out the window? A. Yes, I believe I do, She said, "you better stop that or I'm going to call the police," and so it wasn't very long then before the fighting had stopped and we were back inside and I went into the restroom and washed my face so I would feel better and clean up, I was pretty excited and I was frightened.

"Q. Just a minute, Rebekah, did either one of the boys tell you to go in the bathroom and wash your face? A. Yes, Monty did, Monte Trussell did.

"Q. Now, out in the back there you are speaking of, who all was out there besides you and Sammy and Monty? A. Sammy, Monty and I and then there was this Jimmy Andros, I didn't know him before that night and haven't seen him since, he was standing at the door and he was the one that was egging it on and standing there cursing and everything and he was the one, Sammy said, "She's had enough," and "Don't bother her any more", and Jimmy Andros said, "No, she's still breathing," so I was slapped again and it knocked me down and the board involved was the board— I know there was a blow struck but I don't want to stand and say—I could identify the board in a minute that was in his hand because I saw it and it was frightening to me, to the utmost, but I shut my eyes to it then and as to whether or not I was struck with the

board, I don't know. (Whereupon a certain instrument was marked State's Exhibit Number 1 for identification.)

"Q. (By Mr. Whelan): I hand you this, Rebekah, can you identify that? A. Yes, that is the board, it was a piece of furniture, that's the board.

\* \* \* \* \* \*

"Q. While you were out there, did Sammy Bayless strike you with his hand? A. Yes, he did.

"Q. Did he strike you with that board? A. Sir, I want to be sure in my question, I want to be positively sure, I know the board was in the hand but as to whether or not he hit me with it, I don't know.

"Q. Were you down on the ground, were you standing up fighting or were you down on the ground, had you been knocked down? A. At that time I had been knocked down.

"Q. Were you kicked while you were down, Becky?

"Mr. Samara: Now, if your Honor please, those are leading and suggestive.

"A. Yes, sir, I was kicked.

\* \* \* \* \* \*

"Q. Did either one of those two boys or anyone else grab ahold of you while you were inside? A. Yes, Monte grabbed ahold of me and threw me around up against the wall.

"Q. Was there anything else that was used on you or threatened to be used on you inside? A. There was a brick, yes, sir, but it wasn't, he did not hit me with the brick.

"Q. Who had the brick? A. Sammy had the brick, but he did not hit me with the brick.

\* \* \* \* \* \*

"A. Yes, I ran out and I was jerked around and slapped around still.

"Q. By these same two fellows? A. Yes, the same two fellows.

"Q. In your mind, did you think they were still just having fun with you? A. No, not right then I didn't, I was so frightened that I was—I was reading about Kay Buchanan being killed, I was scared to death.

"Q. Did either one of these boys make the statement that they were going to kill you? A. Yes, Monte made the statement he was going to bury me out of threat.

\* \* \* \* \* \*

"Q. (By Mr. Whelan): Did Sammy make a statement? A. No, he didn't make that statement, he laughed, he laughed when he had the brick in his hand and he said, 'Oh, well, let's just kill her now,' but anyone—it seems if he was going to, now it seems if he was going to he could have, but then I was so frightened I didn't know what—everything was flashing through my mind.

"Q. Did they still have ahold of you when you were outside, Becky? A. Yes sir, they were slapping me around and jerking me, but that was it.

"Q. Did you later pull loose from them and get away from them? A. Yes, sir, I did.

"Q. Where did you go then? A. I went through the front door, out the back door and over the fence to the lady's front door.

\* \* \* \* \* \*

"Q. When you got upstairs, what kind of condition were you in, were you bleeding anywhere, blood coming from your body any place? A. No, sir, not that I recall, not then."

Defendant introduced into the evidence an affidavit made by the prosecuting witness, a part of which read:

"As to Sammy Bayless he never did get in on the fight until after it had started and at the most he only slapped me with his hands several times. He never did have any weapon of any kind whatsoever in his hand to threaten me with. Never threatened me with any weapon, and never reached for one.

He did however, slap me several times. He and I both had been drinking and by reason of this fact I do not want to prosecute him any further in this matter."

In the same affidavit the prosecuting witness further stated:

"As to Monte Trussell I cannot say definitely that he is the one who struck me with the board. All I know is that I was struck with one and that my eyes were on Sam Bayless after he got into the argument and that is why I know definitely he just slapped me and had nothing to do with a weapon. Some one had tried to tell me it was Sam but I really knew different. * * *."

The state introduced for impeachment purposes only a statement made by the prosecuting witness to the county attorney before a notary public, wherein she stated in part:

"Monte Trussell told me again he was going to bury me and Sammy Bayless picked up a huge big board with a nail in it and started beating me. Monte Trussell started kicking me."

The statement went on to say:

"I had gone to Lawton with Sammy Bayless before for prostitution and he had taken my money there. When I was talking to Monte Trussell in Jeep O'Neal's he asked me why I didn't have any money and I told him I hadn't been working. Before this, I voluntarily went to Central State Griffin Memorial Hospital at Norman, Oklahoma, to see if I was sick. I wanted to get out of prostitution. I was declared non-psychotic and released in my own custody. I was eighteen when I worked for Sammy Bayless. It was just a few months ago. He was pimping for me then at Lawton. I have known of him all of my life."

On cross-examination upon the contents of the statement she testified:

"Q. (Reading) 'And Sammy Bayless picked up a huge big board with a nail in it and started beating me', do you recall making that statement? A. Yes, sir, I recall making a statement as to that, he was writing it down as he saw fit.

"Q. Now, just a minute, young lady; did you make that statement at that time, just answer me yes or no. A. Well, I don't believe it was exactly that statement, in exactly that form.

"Q. Was the crux of it the same? A. Yes, I stated he had the board and that I was beaten.

"Q. With the board?

"Mr. Hyde: She didn't say that.

"Q. (By Mr. Myers) I am asking that. A. I didn't say with the board, sir. I stated before I didn't know if I had been hit with the board or not. Surely if I had been hit with a big, huge board—now, that I have thought it over after my fright is gone and my nerves are calm, after this time, and being thought over, I would have had some broken bones or fractures or something or the other and there is nothing fractured or broken, because that's a big board and surely if the boy meant to hurt me bad, he could strike a pretty hard blow if he wanted to.

* * * * * *

"A. I saw Sammy with the board but then he—I don't know if he was throwing the board out of my way, I don't know what he was doing with the board, it's only logical to assume had the board struck me I would have been hurt worse than I would have been. There would have been a broken bone or the flesh would have been torn or something fractured in which there were not because x-rays were made.

"Q. Are you afraid of Sam Bayless at this time? A. No, I'm not."

Mr. Benson testified he lived about 100' from the night club and about 6 or 7 or

7:30, he was awakened by his wife who called his attention to the fight taking place behind the night club. That he looked out the window:

"A man was hitting a woman and he had her backed up against the building and he was hitting her, the best I could tell, in the stomach with his fist and then when she would fall down, he would jerk her back up and hit her again: so in a little bit—well, no, in the meantime, I hollered down and told them if they didn't stop it I was going to call the police so they went inside the building. I laid back down and then later I heard the screaming again so I called the police and they came out. While I was calling the police this woman was at our front door."

The woman was helped upstairs and laid down. On cross-examination the witness could not say who the man was that he saw beat the girl. He further stated he saw no weapon involved. That he saw nothing in the man's hand. He agreed that the girl was in pretty bad shape and needed medical care right then. Mrs. Benson testified that when she looked out the window:

"There was 3 men out there, one was standing up against the door and then there was one that was kicking her and one had a board and was hitting her, and she was begging them to stop and one of them quit for a few minutes and she got up and the other one knocked her down and the one that had quit first grabbed her purse and opened it up and began searching it and said "She doesn't have any money in here," and threw the purse down again, so she got up to her feet again and he knocked her down again and one of them was kicking her with his heels and the other one was standing off to the side but every time she would get up they would knock her down * * *."

She further stated that the girl came to her house and was helped upstairs and was gasping for breath. That the officers came and left and that Jeep O'Neal came and took the girl away. She didn't know where the girl was taken.

Officer Thompson testified upon arrival he found the girl crawling up the stairs:

"She was crawling up the steps, she couldn't walk. We got her on up the steps and laid her on the divan and she had quite a few marks on her that I could see at the time."

He further testified she was hysterical, breathing hard and in pretty rough shape. That he left her there, did not call a doctor. That Jeep O'Neal promised to call one.

Prosecuting witness was seen about 8:30 p. m. by Dr. John R. McInnis and summarized the injuries as follows:

"I found that her right eye was practically closed, it was swollen and blue; it had been traumitized and the side of her head had been hit or bruised with something and her arm and shoulder and her back, across her back, were blue and bruised places, subcutaneous hematoma would cause a black eye we speak of, the same type of thing under the skin. She was complaining of her eye particularly; we had x-rays made of her eye and her ribs and across her back, and her legs and thighs were bruised up pretty severely. It looked as though she had been severely beaten with something or traumatized severely, probably with—I believe it would have had to been with some kind of a blunt instrument. She wasn't cut, she was bruised but not severely, the skin wasn't broken in other words, it was just a severe beating. We got the x-rays and there were no fractures, no bones broken in her orbital ridge or the area about her face or her nose, no fractures there or in her ribs. She was just painfully sore and there was no treatment indicated except go to bed. We didn't put her in the hospital or anything like that, it wasn't necessary for that, and just let it wear off and told her to put some cold packs to it if it was bad and

hurt her a great deal, but it had been several hours since this had happened, probably ten or twelve hours."

The doctor further testified as follows:

"A. I believe I have. I think this type of trauma had to be done with something, I don't believe you could have done it with the hand, I think it would have bruised the hand severely as it would have bruised the body, that is about all I have to add to it. It was something that had to be a hard blow or a heavy blow or some blunt or heavy instrument like a black-jack of a piece of heavy leather or wood or something like that, I don't know exactly.

"Q. Would a heavy board have done it, Doctor? A. It would have."

On cross-examination the doctor admitted there were no cuts nor was the skin broken. He was shown the alleged weapon described as a board 3' long and 1½" thick with a nail protruding and said he did not necessarily believe a blow by such an instrument would have broken the skin if hit with the flat side of the board.

Monte Trussell, the codefendant, testified he was charged jointly with the defendant but plead guilty, evidently to the crime of assault and battery with a dangerous weapon and received six months in the county jail. He testified, relative to the fight, as follows:

"Q. Do you know who was involved in the fight primarily, who it started between? A. It started between me and Rebekah.

"Q. Now, had you been drinking any that night? A. Yes, sir, I had been drinking quite a little bit.

"Q. You had. Did you go outside and have a fight with Rebekah? A. Yes, sir.

"Q. Now, was Sam with you when this fight started? A. No, sir, he wasn't there when it started.

"Q. Sir? A. He wasn't there when it started.

"Q. Was there any weapons or anything used at all in that particular occasion? A. Yes, sir.

"Q. What was used? A. A board.

"Q. Who had the board? A. I did.

"Q. Did you ever strike Becky with this board? A. I think I hit her, I might have hit her once or twice with it.

"Q. Did Sam ever hit her with the board? A. No, he jerked the board away from me.

"Q. I beg your pardon? A. He jerked the board away from me and slung it back over on the ground there and told me not to hit her with it.

"Q. Sam did? A. Yes.

"Q. Well, did Sam ever have hold of the board then? A. Yeah, he grabbed it out of my hand to keep me from hitting her.

"Q. What was Sam's part in the fight? A. He didn't have any part in it.

"Q. Did he ever strike Becky? A. He slapped her once or twice, she kept egging him on after me and her were already through, she kept egging it on.

"Q. Did he ever strike her with the board? A. No, sir.

"Q. Did he make any effort to control the fight? A. Yes, sir.

"Q. What did he say or do? A. He tried to stop me from whipping her, he said she had enough."

Out of this set of facts grew the charge upon which the defendant was convicted and sentenced to prison for a period of five years for the crime of assault and battery with a dangerous weapon.

■ There have been no briefs filed by the defendant or the state. The defendant who is now incarcerated in the state penitentiary pending appeal has filed a paper "In support to petition in error" in which he sets out what he considers to be error. There are no cases cited and it serves only

as a supplement to the original petition in error. Where there are no briefs filed, this court is not duty bound to pillage the record to search out other than fundamental error. However, the Court has been liberal with those who appear pro se, because of financial inability to hire counsel.

In the petition in error and the supplement thereto, the substance of defendant's contention challenges the sufficiency of the evidence to support the conviction pronounced by the jury's verdict. In considering this contention the court is bound by the rule heretofore adopted by this Court which is well stated in the case of Hubbard v. State, 71 Okl.Cr. 373, 112 P. 2d 174:

"While it is well settled that this court will not reverse a conviction for insufficiency of the evidence, if there is any substantial evidence, although circumstantial, from which a reasonable and logical inference of guilt arises, the converse rule is also well settled that, it is not only the province but the duty of the court to set aside such a verdict when it is contrary to law and the evidence, or where there is no evidence to support it, or there is a failure to prove some essential matter to establish the offense charged, or where it appears that the verdict was rendered as a result of passion or prejudice. The performance of this duty on the part of the court is the exercise of legal discretion and judgment as to the sufficiency of the evidence to overcome the legal presumption of innocence to which everyone is entitled who is put on trial for an offense."

The charging part of the information in the instant case alleges that the defendant:

" * * * did then and there, willfully, unlawfully, feloniously, wrongfully and intentionally while acting together and in concert each with the other, commit an assault and battery with intent to kill upon the person of another, to-wit: Rebekah Haywood, by then and there beating and striking the said Rebekah Haywood with their fists and by kicking the said Rebekah Haywood and by striking and hitting with a heavy board approximately one yard long and one and one-half inches thick from which there was a nail protruding and by the use of a brick directed at the head of the said Rebekah Haywood, which board and brick were held in the hands of the said defendants and which weapons were deadly weapons and used with such force and violence as was likely to produce death to the said Rebekah Haywood * * *".

The evidence related at the trial, the pertinent part of which is heretofore recited, is not sufficient to support the charges made in the information. There is no substantive testimony any where in the record to prove the defendant committed the crime as alleged as an individual principal. The record is void of substantive testimony showing that this defendant struck or hit the prosecuting witness with the described board or brick. However, the defendant was charged with acting concertly and together with another person. If there is life to be breathed into the verdict, it is administered by Title 21 O.S.A. § 172, which reads as follows:

"All persons concerned in the commission of crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, are principals."

There was testimony by Mrs. Benson that this defendant was aiding the codefendant at the time the board was being used. Mrs. Benson's testimony which is heretofore recited, saw two men engaged in the attack upon the prosecuting witness, one of which was using a board, and the other one hitting the defendant, knocking her down and kicking her. The testimony of all parties makes it conclusive that the two men sponsoring the attack were the

defendant, Sammy Bayless and codefendant Monte Trussell. The codefendant's testimony attempts to place the defendant as a protector of the prosecuting witness rather than aiding or abetting, but the conflict in the testimony of Mrs. Benson and Monte Trussell created a question for the jury which was settled adversely to the defendant. This court is bound by the rule laid down in the case of Bundy v. State, 16 Okl.Cr. 481, 184 P. 795, wherein it was said:

"All persons concerned in the commission of a crime, whether it be a felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commision, though not present, are 'principals.'"

No doubt the jury convicted the defendant upon the theory that he was aiding and abetting at the time the crime was committed. The evidence of the prosecuting witness depicts the codefendant Trussell as the leading principal. The codefendant admits unequivocally that he alone administered the blows with the weapon which was alleged to have been a dangerous weapon and that the defendant's only act of violence was hitting the victim with his hands, and that the defendant attempted to stop him from hitting the victim with the board. The codefendant testified he plead guilty to the offense and was sentenced to serve six months in the county jail. The evidence produced by the state against the defendant creates a weak case. Though this court is hesitant to substitute its opinion for that of the jury we earnestly feel that the jury was incensed and animated by the nature and character of the case which involved an admitted prostitute and her former pimp. A gruesome fact indeed, and no doubt was greatly considered by the jury and resulted in the maximum sentence, five years in the Oklahoma State Penitentiary, being imposed. Defendant aided and abetted a leading principal who was sentenced to six months in the county jail for his part in the crime. The court is of the opinion that justice would be best served if defendant's sentence was modified from five years in the state penitentiary to a term of two years in the state penitentiary. It is therefore ordered, and the judgment and sentence as modified is affirmed.

POWELL, P. J., and BRETT, J., concur.